**PAPAGO TRIBAL UTILITY AUTHORITY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Arizona Public Service Company, Intervenor.**

Nos. 82–1338, 82–1339.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 21, 1983.

Decided Dec. 13, 1983.

As Amended Dec. 22, 1983.

Arnold D. Berkeley, Washington, D.C., with whom Richard I. Chaifetz, Washington, D.C., was on the brief, for petitioner.

Arlene Pianko Groner, Atty., F.E.R.C., Washington, D.C., with whom Charles A. Moore, General Counsel, and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent.

Brian J. McManus, Washington, D.C., with whom Nicholas H. Powell, Phoenix, Ariz., and Richard M. Merriman, Washington, D.C., were on brief, for intervenor. Steven M. Wheeler, Phoenix, Ariz., also entered an appearance for intervenor.

Before EDWARDS and SCALIA, Circuit Judges, and VAN DUSEN,* Senior Circuit Judge of the United States Court of Appeals for the Third Circuit.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge.

Papago Tribal Utility Authority petitions under 16 U.S.C. § 825*l*(b) (1982) for review of an order of the Federal Energy Regulatory Commission approving an increase in rates paid to the Arizona Public Service Company. The issues on appeal are whether the parties' contract authorized the Commission to fix "just and reasonable" rates, whether the Commission's finding under § 206(a) of the Federal Power Act that prior rates were unjust and unreasonable was procedurally and substantively sound, and whether the new rates could be made effective as of a date before that explicit finding was made.

On February 26, 1976, the Arizona Public Service Company ("APS") filed with the Federal Power Commission a Notice of Rate Change affecting electricity rates to

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

its wholesale for resale customers, including the Papago Tribal Utility Authority ("PTUA"). PTUA filed a *Protest, Petition to Intervene,* and *Motion to Reject,* alleging, inter alia, that its contract with APS did not permit unilaterally proposed rate changes under § 205 of the Federal Power Act, 16 U.S.C. § 824d (1982). The Federal Power Commission held to the contrary, and permitted the filed rates to take effect May 1, 1976, pending investigation into their lawfulness and subject to refund on the basis of that investigation. *Arizona Public Service Co.,* 55 F.P.C. 1503, 1507–08 (1976) (*Order Accepting in Part, Rejecting in Part, etc.*); *Arizona Public Service Co.,* 56 F.P.C. 1834, 1837–38 (1976) (*Order Denying Application for Rehearing, etc.*). On August 1, 1978, the Federal Regulatory Energy Commission, statutory successor to the Federal Power Commission,[1] approved the proposed rates as just and reasonable, subject to minor adjustment and to corresponding refund for the period during which the unadjusted rates had been in effect. *Arizona Public Service Co.,* 4 FERC (CCH) ¶ 61,101 (*"Order Affirming Initial Decision"*).

In a previous appeal, this court disagreed with the Commission's interpretation of the contract between APS and PTUA, holding that it did not contemplate unilateral change under § 205 of the Act. *Papago Tribal Utility Authority v. Federal Energy Regulatory Commission,* 610 F.2d 914, 930 (1979) (*"Papago I"*). Reconsidering the contractual language on remand, the Commission found that it authorized a Commission-initiated proceeding to set just and reasonable rates under § 206 of the Act, 16 U.S.C. § 824e (1982). *Arizona Public Service Co.,* 18 FERC (CCH) ¶ 61,066, at 61,110 (Jan. 25, 1982) (*"Order on Remand"*). Concluding that a new hearing would be duplicative and wasteful, the Commission made an explicit finding (for the first time) that APS's pre-existing rates were not "just and reasonable," and made the rates approved in its 1978 Order effective from August 1, 1978 so as to put the parties in the position they would have occupied had the Commission initially interpreted the contract as later required by *Papago I. Id.* PTUA's *Application for Rehearing* was denied on March 26, 1982, *Arizona Public Service Co.,* 18 FERC (CCH) ¶ 62,582; this petition for review followed.

### THE RATE-CHANGE STANDARD UNDER THE APS/PTUA CONTRACT

The Federal Power Act provides two routes for changing electricity rates: The seller may initiate rate changes under § 205 of the Act, by filing a new schedule, which is subject to Commission review for justness and reasonableness, but which takes effect immediately (after the sixty-day notice period required by subsection (d)), subject to Commission suspension of no more than five months pending investigation;[2] and the Commission itself may initiate rate changes (usually, of course, upon application of one of the parties to the contract)

---

1. In 1977, most functions of the Federal Power Commission were transferred to the Federal Energy Regulatory Commission. Department of Energy Organization Act, Pub.L. No. 95–91, § 402(a), 91 Stat. 565, 583–84 (codified at 42 U.S.C. 7172(a) (Supp. V 1981)).

2. Section 205, 16 U.S.C. § 824d (1982), provides:

    (a) All rates and charges made ... by any public utility for or in connection with the transmission or sale of electric energy ... shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

    .    .    .    .    .    .

    (d) [N]o change shall be made by any public utility in any ... rate ... except after sixty days' notice .... Such notice shall be given by filing with the Commission ... new schedules ....

    (e) Whenever any such new schedule is filed the Commission shall have authority ... to enter upon a hearing concerning the lawfulness of such rate ...; and, pending such hearing and the decision thereon, ... may suspend the operation of such schedule and defer the use of such rate, ... but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings ... the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective.

under § 206, but only upon finding that the existing rates are unjust, unreasonable, unduly discriminatory or preferential.[3]

These provisions permit essentially three contractual arrangements for rate revision. First, the parties may agree that new rates can be unilaterally and immediately imposed by the utility, subject, under § 205, to Commission suspension for no longer than five months, and to ultimate Commission disallowance if they are not just and reasonable. Second, by broad waiver, the parties may eliminate both the utility's right to make immediately effective rate changes under § 205 and the Commission's power to impose changes under § 206, except the indefeasible right of the Commission under § 206 to replace rates that are contrary to the public interest, "as where [the existing rate structure] might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory."[4] *FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 355, 76 S.Ct. 368, 372, 100 L.Ed. 388 (1956). Third, the parties may contractually eliminate the utility's right to make immediately effective rate changes under § 205 but leave unaffected the power of the Commission under § 206 to replace not only rates that are contrary to the public interest but also rates that are unjust, unreasonable, or unduly discriminatory or preferential to the detriment of the contracting purchaser. *See Public Service Co. of New Mexico v. FERC,* 628 F.2d 1267, 1270 (10th Cir.1980), *cert. denied,* 451 U.S. 907, 101 S.Ct. 1974, 68 L.Ed.2d 295 (1981); *Louisiana Power & Light Co. v. FERC,* 587 F.2d 671, 676 (5th Cir.1979). The first issue in the present case is whether the Commission was correct in concluding that the APS/PTUA contract

adopted the last of these three regimes. In approaching that question, we accord appropriate deference, though not of course conclusive validity, to the judgment of the expert agency that deals with such contracts regularly. *Kansas Cities v. FERC,* 723 F.2d 82 at 87 (D.C.Cir.1983).

The portion of the APS/PTUA contract that governs rates is Section 3. It sets forth a base monthly rate and a base monthly minimum, the former consisting of local facilities charge, demand charge, and energy charge, each subject to monthly adjustment. It also permits adjustments for reductions in maximum demand attributable to cancellation of PTUA contracts with third parties. Subsection 6, the last subsection of section 3, provides:

> The rates hereinabove set out in this Section 3 . . . are to remain in effect for the initial one (1) year of the term of this contract and thereafter unless and until changed by the Federal Power Commission or other lawful regulatory authority, with either party hereto to be free unilaterally to take appropriate action before the Federal Power Commission or other lawful regulatory authority in connection with changes which may be desired by such party.

In *Papago I,* we held that the contract did not permit unilaterally effected rate increases under § 205. In its *Order on Remand,* the Commission held that the contract permitted changes under § 206 on the basis of a just-and-reasonable standard.

PTUA makes essentially three objections to the Commission's conclusion. First, that the language of the contract excludes just-and-reasonable changes; second, that apart from the language, the reasoning of *Papago*

---

**3.** Section 206(a), 16 U.S.C. § 824e(a) (1982), provides:

> Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate . . . collected by any public utility . . . is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate . . . to be thereafter observed and in force, and shall fix the same by order.

**4.** This apparently means unduly discriminatory or preferential to the detriment of purchasers who are not parties to the contract. Discrimination or preference that operates against the contracting purchaser can presumably be waived—just like unreasonableness—up to the point where it produces some independent harm to the public interest.

*I* requires such a conclusion; and third, that the issue deserved an evidentiary hearing. We find none of these objections well taken.

■■■ PTUA contends that the contractual language merely recognized the possibility of future rate change and that such recognition does not constitute an agreement to apply a just-and-reasonable standard in § 206 proceedings. We disagree. The contract draws a clear distinction between "the initial one (1) year," during which the originally specified rates "are to remain in effect," and subsequent years, during which those rates are to subsist "unless and until changed by the Federal Power Commission or other lawful regulatory authority." The limitation envisioned during the initial year cannot abridge the right of the parties to bring to the attention of the Commission during that period rates not in the public interest. The Commission's obligation to insure that rates do not violate that prescription is imposed for the direct benefit of the public at large rather than (like the prescription of just and reasonable rates) for the direct benefit of the seller and purchaser; and it therefore cannot be waived or eliminated by agreement of the latter. Even agreement not to bring a rate contrary to the public interest to the Commission's attention would be akin to a contract to suppress evidence, and therefore void. *See* RESTATEMENT OF CONTRACTS § 554 (1932); 14 WILLISTON ON CONTRACTS § 1716 at 881 (3d ed. 1972); 6A CORBIN ON CONTRACTS § 1430 at 380 (1962). Thus, applying the principle that a contractual provision should, if possible, be interpreted in such a fashion as to render it lawful rather than unlawful (*ut magis valeat quam pereat*), the restriction envisioned during the first year of the contract must allow rate changes required by the public interest.

The scheme to be in effect "thereafter"— obviously intended to be less restrictive— must therefore permit changes that are just and reasonable.

Moreover, specific acknowledgment of the possibility of future rate change is virtually meaningless unless it envisions a just-and-reasonable standard. The public-interest standard is practically insurmountable; the Commission itself is unaware of any case granting relief under it. *Order on Remand,* 18 FERC (CCH) ¶ 61,066 at 61,109. Future rate changes would be a dim prospect, hardly worthy of recognition, if the parties did not intend the just-and-reasonable standard to govern. All but one of the cases cited by petitioner in which a contractual recognition of alteration by regulatory action was held to establish only a public-interest standard involved clauses recognizing the possibility of regulatory change in general, not rate change in particular. *See* cases discussed in *Kansas Cities, supra,* at 87–88. In the one exception, the issue was neither discussed nor understood.[5]

PTUA contends that the contract's provisions for automatic adjustment in the base monthly rate reflect an intent to restrict other rate changes as much as possible. There is some force to that argument, but we cannot say that it overcomes the strong textual argument based upon the separate provision for changes before and after the first year of the contract. The automatic adjustments are of course not rendered entirely superfluous if just and reasonable rate revisions are allowed. Since reasonableness is not a fixed point but a zone, *see FPC v. Conway Corp.,* 426 U.S. 271, 278, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626 (1976); *FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 585–86, 62 S.Ct. 736, 742–43, 86 L.Ed. 1037 (1942), there would be scope for operation of the adjustment provisions before the

---

5. In *Carolina Power & Light Co.,* 47 F.P.C. 1 (1972), the Federal Power Commission adopted a hearing examiner's conclusion that the relevant contract did not permit § 205 changes. It was only in connection with that issue that the hearing examiner had considered the regulatory change provision. *Id.* at 13–14. And once that issue was resolved, the Commission automatically scheduled hearings in which the utility was to satisfy the public-interest standard— in the belief that *FPC v. Sierra Pacific Power Co., supra,* made that standard applicable in all § 206 proceedings. *Id.* at 4. As our earlier discussion indicates, that early interpretation of *Sierra* was incorrect.

factors producing the adjustment took the rate entirely outside the zone of reasonableness.

Finally, our decision in *Papago I* did not restrict § 206(a) increases under this contract to those in the public interest. The opinion held that the second clause of subsection 3.6 does not permit unilateral rate changes under § 205, but "simply preserves the right of either party to petition the Commission for relief pursuant to Section 206(a)," 610 F.2d at 928. It did not address the standard of proof to be applied in the § 206 proceeding, and indeed explicitly disclaimed any ruling on that point. *Id.* at 930 n. 127. As for its invocation of the canon that ambiguous contracts are to be construed against the drafter: That canon does have force with regard to the point at issue in *Papago I,* since application of § 205 invariably favors the utility. The adoption of a strict or lenient standard for rate change, however, does not necessarily favor either side, since its effect will depend upon whether upward or downward revision is sought. *See Kansas Cities, supra,* at 87.

■ PTUA also objects to the Commission's refusal to consider evidence extrinsic to the contract with regard to this issue of interpretation, including such matters as proposals put forward in the negotiations and eliminated in the final contract. We have held with specific reference to this issue of rate revision in federal power contracts that " '[i]n the absence of ambiguity the intent of the parties to a contract must be ascertained from the language thereof without resort to parol evidence or extrinsic circumstances.' " *Appalachian Power Co. v. FPC,* 529 F.2d 342, 347–48 (D.C.Cir.1976) (footnote omitted) (quoting *Simpson Bros. Inc. v. District of Columbia,* 179 F.2d 430, 434 (D.C.Cir.1949), *cert. denied,* 338 U.S. 911, 70 S.Ct. 350, 94 L.Ed. 561 (1950)). And as we have noted in other contexts, "[a] contract is not ambiguous simply because the parties disagree on its interpretation," *Clayman v. Goodman Properties, Inc.,* 518 F.2d 1026, 1034 (D.C.Cir.1973) (footnote

omitted). Rather, the "standard for determining ambiguity [that] appears to be in fairly general use by American courts" is whether the contract is " 'reasonably susceptible of different constructions or interpretations.' " *Lee v. Flintkote Co.,* 593 F.2d 1275, 1282 (D.C.Cir.1979) (footnotes omitted) (quoting *1901 Wyoming Ave. Coop. Ass'n v. Lee,* 345 A.2d 456, 461 n. 7 (D.C. 1975)). In rejecting the proffer of extrinsic evidence, the Commission specifically found that "the language of the contract is not reasonably susceptible to the interpretation suggested by PTUA." *Order on Remand,* 18 FERC (CCH) ¶ 61,066 at 61,111. We think it proper to give the Commission the same degree of deference with regard to this issue as we accord it with regard to the ultimate question of the meaning of the contract. In light of the analysis of the contractual terms set forth above, we sustain the refusal to consider extrinsic evidence.

### VALIDITY OF THE FINDING THAT EXISTING RATES WERE NOT JUST AND REASONABLE

PTUA makes procedural and substantive attacks on the Commission's holding that the existing rates were not just and reasonable. It argues that the finding that APS would only earn a .552 percent rate of return under the existing rate schedule lacked substantial evidence and that the Commission's reliance on the compliance filing, which was made before the justness and reasonableness of existing rates was at issue, was unfair.

■ We find the first claim wholly without merit. The Commission's .552 percent figure was derived from the application of standard ratemaking principles to data from the compliance filing. Brief for Respondent at 20 n. 15.[6] PTUA has neither refuted the data nor disputed the principles nor questioned the accuracy of the computation.

■ PTUA's procedural claim is similarly ill founded. The compliance filing was part

---

**6.** We note that some of the page citations set forth in the Commission's brief for the figures used in this computation are inaccurate; their substance, however, is correct.

of the record, *see* R. 4127–4311. When it was originally submitted, PTUA had ample opportunity and incentive to challenge any inaccuracies. PTUA's assertion that its challenge to the compliance filing "would have been out of order" because it did not contend lack of compliance with the Commission's orders, Reply Brief at 20, is of course circular. If it believed the filing contained significant factual inaccuracies, it could and should have made such a contention. It is true that at the time the compliance filing was made PTUA believed that it would be used only for the purpose of fixing new rates and not in addition for the purpose of showing the unreasonableness of old rates. But that establishes, at most, that PTUA "would have tried harder" if the full ultimate use of the data had been known—a complaint we have elsewhere found inadequate to excuse failure to challenge. *Association of Massachusetts Consumers, Inc. v. SEC*, 516 F.2d 711, 716 (D.C. Cir.1975), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976). Moreover, the *Order on Remand*, by alluding to the compliance filing, made it clear that it was being used by the Commission to determine the reasonableness of the old rates, and thus provided "sufficient detail to allow for meaningful adversarial comment" in that specific context, *United States Lines, Inc. v. FMC*, 584 F.2d 519, 535 (D.C.Cir.1978). PTUA declined to make such comment in its *Application for Rehearing*, identifying not a single element of inaccuracy in the compliance filing, and making only the same generalized demand put forth here, that a new opportunity for evidentiary hearing was required. *Id.* at 9. Even at the current stage of these proceedings, PTUA notably makes no assertion that the existing rates were in fact just and reasonable. In these circumstances, we are persuaded that even if the Commission's use of the compliance filing were an improper reliance on extra-record evidence, it would not justify invalidation of the agency's action because no substantial prejudice has been shown to result. *See United States v. Pierce Auto Freight Lines, Inc.*, 327 U.S. 515, 530, 66 S.Ct. 687, 695, 90 L.Ed. 821 (1946); *Association of Massachusetts Consumers, Inc. v. SEC, supra.*

### RETROACTIVITY OF THE COMMISSION'S ORDER

In addition to setting new rates under § 206, the Commission in its January 25, 1982 order made the rates effective from August 1, 1978, the date of its prior rate determination. The Commission reasoned that

> The effect of this action would be to place all parties in the position they would have been in had the FPC in its prior orders interpreted the PTUA and ED–1 contracts as required by the court's decision. We firmly believe the Commission has the responsibility and authority to place the parties in the same position they would have been in if the FPC had ruled correctly in the first instance.

*Order on Remand*, 18 FERC (CCH) ¶ 61,066 at 61,110. Section 206(a) of the Federal Power Act empowers the Commission to determine and impose just and reasonable rates only after finding that existing rates are unjust, unreasonable, unduly discriminatory or preferential. In this case the Commission did not make such an explicit finding on August 1, 1978, because it believed it was properly proceeding under § 205, which requires only that the utility's newly filed rates be found just and reasonable, and not that the old ones be found unjust, unreasonable, unduly discriminatory or preferential. The Commission did not explicitly make the latter finding until its January 25, 1982 *Order on Remand*, after we had made clear that the contract would not permit a § 205 proceeding. The Commission then determined that the rates in effect before August 1, 1978 produced an unjust and unreasonable rate of return. *Id.* The final issue we must address is whether the Commission's actions in this regard were sufficient to comply with § 206(a).

■ The Supreme Court has told us to look to the substance of the requirements of § 206(a) rather than to its rigid formalities, *FPC v. Sierra Pacific Power Co., supra,* 350 U.S. at 353, 76 S.Ct. at 371. In the circumstances of the present case, we think the

substance of a finding of unjustness and unreasonableness was adequately met on August 1, 1978. In its decision of that date, the Commission affirmed, with minor modifications not now relevant, the Initial Decision of its ALJ. *Order Affirming Initial Decision.* That decision had not only found that 9.41 percent was a just and reasonable composite rate of return on capital to be derived from the PTUA contract; but had also found that the joint proposal of Arizona Electric Power Cooperative and PTUA for a 12.25 percent rate of return on *equity* capital was outside the zone of reasonableness. *Arizona Public Service Co.,* 1 FERC (CCH) ¶ 63,045 (Dec. 19, 1977), at 65,332 ("*Initial Decision*"). Even if one assumes that a *zero* rate of return on debt capital could be reasonable (though in fact even PTUA itself suggested 7.43 percent for bonds and 7.90 percent for preferred stock, *see Initial Decision* at 65,329), at the debt-equity ratio found by the Commission (64.46 percent debt to 35.54 percent equity, *see Order Affirming Initial Decision,* 4 FERC (CCH) ¶ 61,101 at 61,211), the 12.25 percent equity figure would have yielded a composite rate of return of 4.35 percent. Thus, even allowing for a wide margin of error, the ALJ had necessarily found that a composite rate of .552 percent was outside the zone of reasonableness.

█ Even if we assume that the ALJ's finding on this point was not authoritatively adopted by the Commission, we must still find that a determination of the unreasonableness of a .552 percent rate of return was effectively made in the 1978 Order. To be sure, there is, as we have noted, no single reasonable rate for any contract, but rather a zone of reasonableness, *see FPC v. Conway Corp., supra; FPC v. Natural Gas Pipeline Co., supra,* so that the Commission's finding that 9.41 percent was just and reasonable did not amount to a finding that every other rate of return was not. But the zone of reasonableness is not endless, or else ratemaking would be a barren exercise and judicial review would be impossible. There is some point at which two rate dispositions are so far apart that they cannot possibly be embraced within the same zone.

We are not normally inclined to enter into such an inquiry, but the distinctive circumstances of the present case justify it. We find as a matter of law that rates under a particular contract yielding a .552 percent rate of return and rates yielding a 9.41 percent rate of return—an 1800 percent differential—cannot both possibly fall within the zone of reasonableness. The Commission's 1978 determination that the latter were reasonable therefore amounted to a finding that the former were not.

Thus, either through reliance upon adoption of the ALJ's finding, or through our independent evaluation of the sheer expanse of the differential, we conclude that the Commission determined in 1978 that rates producing a .552 percent rate of return were unreasonable. As we now know, that amounted to a determination that the existing rates were unreasonable; even PTUA does not assert that the return from those rates was sufficiently above the .552 figure to avoid invalidation on the basis described above. The only genuine dispute is whether, in order to permit the new rates to take effect from 1978, the Commission must have *then undergone* the calculation which revealed the fact of a .552 percent rate of return. We think not. If, as the Commission has subsequently found, that was the actual rate of return; and if that rate of return was in 1978 found to be unreasonable; we believe that in the distinctive circumstances of this case, the substantial purpose of the § 206(a) requirement has been met. We note in this regard that the 1977 ALJ and 1978 Commission opinions which approved APS's rate increase under its contract with PTUA also approved similar increases under APS's other supply contracts, some of which were from the beginning recognized by the Commission to require § 206 procedures. That portion of the opinions which, with regard to those § 206 contracts, pertained to consideration and determination of the unreasonableness of existing rates, consisted *entirely* of two paragraphs in the ALJ's *Initial Decision.* First, under the heading "Ultimate Findings and Conclusions":

(4) Applicant's rates which are the subject of a Section 206 investigation in these dockets, as noted above, are unjust and unreasonable and unlawful, and Applicant should, therefore, be required to file just and reasonable rates as necessary to conform to this decision.

*Initial Decision,* 1 FERC (CCH) ¶ 63,045 at 65,343. And under the heading "Order":

Wherefore, *It is ordered,* subject to review by the Commission, that: . . .

(B) The existing rates referred to in paragraph (4) above are unjust and unreasonable and unlawful, and shall be changed to conform to this decision.

*Id.* There is no doubt in our mind that, had it been understood that the present contract was also subject to § 206, it would have been routinely included among the referenced contracts, after routine receipt of the additional factual data necessary for that purpose. One circuit has held that when new rates are fixed under § 206 "[t]here is no validity to the contention . . . that there must be a finding or determination directed to the old schedule." *Public Service Co. of New Mexico v. FERC, supra,* 628 F.2d at 1270. We are not prepared to go that far; but neither are we prepared to "make a fetish" of the § 206 requirement, *United States v. Pierce Auto Freight Lines, Inc., supra,* 327 U.S. at 530, 66 S.Ct. at 695, by requiring a three and one-half year deferral of a justified rate increase because, although the facts are clear, not all the magic words were uttered.

■ We emphasize that we will not generally be drawn into the complex analysis here indulged. Whether or not the finding that a new rate is reasonable (or that a proposed new rate is unreasonable) amounts to a finding that the old one was unreasonable, it will ordinarily be an abuse of the Commission's discretion not to make the latter finding explicit; and we will ordinarily inquire no further. We have been willing to probe into the "substance [of] the requirements," *FPC v. Sierra Pacific Power Co., supra,* 350 U.S. at 353, 76 S.Ct. at 371, in the present case only because of the understandable reason for the Commission's failure to comply in form as well as in substance with the terms of the statute (*viz.,* the confusion produced by an unclear contract), and because of the Commission's subsequent explicit finding of unreasonableness which leaves no doubt that we are making a rate judgment with which the Commission fully agrees.

*Petition denied.*