HORN & HARDART
COMPANY, Appellant

v.

NATIONAL RAILROAD PASSENGER
CORPORATION.

No. 85–5722.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 20, 1986.
Decided June 17, 1986.

J. Skelly Wright, Senior Circuit Judge,
dissented and filed an opinion.

Allen R. Snyder, Washington, D.C., with whom Robert J. Elliott and Stephen A. Goldberg, Washington, D.C., were on brief, for appellant.

John C. Morland, with whom Christopher M. Klein, Washington, D.C., was on brief, for appellee.

Before: STARR and BUCKLEY, Circuit Judges, and WRIGHT, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge STARR.

Dissenting opinion filed by Senior Circuit Judge WRIGHT.

STARR, Circuit Judge:

This appeal is taken from the District Court's grant of summary judgment in favor of the National Railroad Passenger Corporation, more commonly known as "Amtrak." The issue presented is whether the trial court erred in its interpretation of termination provisions contained in three 1980 leases between Amtrak, as owner of the Pennsylvania Station in New York City, and The Horn & Hardart Company, the proprietor of several commercial establishments situated within Penn Station. Horn & Hardart contends that the District Court improperly granted summary judgment in the face of a need for further factual development both as to the meaning of the termination provisions and as to whether the facts, as ultimately adduced, would have warranted Amtrak's invocation of these clauses. While Horn & Hardart's arguments are not without force, we are persuaded in the end that the District Court's disposition of this case is correct. We therefore affirm.

I

Horn & Hardart is a familiar corporate face in New York. Its operations extend

underground, as it were, to include within the confines of Penn Station three restaurant and cocktail lounge operations each of which is the subject of a separate lease. The three leases contain identical provisions in respect of termination, permitting that power to be invoked by Amtrak:

> in the event that [Amtrak] shall require the demised premises for its Corporate purposes . . ., or in case of the proposed re-construction or demolition of the terminal building in which the demised premises are located (resulting thereafter in the re-construction or demolition thereof). . . .

In November 1984 Amtrak dispatched to Horn & Hardart termination notices with respect to all three leases. Amtrak's stated reason for displacing its long-standing lessee was to permit construction of an ambitious project, duly approved by Amtrak's board of directors, to modernize Penn Station pursuant to a master plan. As represented to the court below, "Amtrak's current intention is to reconstruct the portion of Pennsylvania Station in which the demised premises are located so that a new ticket facility can be installed on the premises . . . occupied by [Horn & Hardart]." Amtrak's Statement of Material Facts As To Which There Is No Genuine Dispute ¶ 7.

Horn & Hardart challenged Amtrak's use of the termination clause, repairing to United States District Court here in Washington, Amtrak's corporate situs and the jurisdiction whose law governs the three leases in accordance with applicable federal law. 45 U.S.C. § 546(d) (1982). Horn & Hardart averred that since the Penn Station operations commenced in 1967 the Company had expanded substantial sums to improve the leased premises, as most recently evidenced by the conversion in 1980 of a "Horn & Hardart" coffee shop to an "Arby's" and the modernization of its two other premises, the "Iron Horse" and the "Dolphin Bar," in which approximately $1 million had previously been invested. To protect its sizable investments, Horn & Hardart argued, the Company had not only

negotiated long-term leases but had succeeded in limiting substantially Amtrak's powers of termination. Specifically, the parties had agreed to the language, which we have quoted above, only after Horn & Hardart had fended off in negotiations a considerably more sweeping termination clause advanced by Amtrak which would have empowered the latter to terminate the leases (upon ninety days' written notice)

> in case [Amtrak] shall desire to use the demised premises, or any portion thereof, either for itself or through agreement with others for transportation or public service purposes, or for construction, re-construction . . . of that portion of the building of which the demised premises constitute a part. . . .

The upshot of this successful negotiation effort, Horn & Hardart maintained,

> was to restrict Amtrak's right to terminate the leases to situations which would "require" termination because of activities affecting Amtrak as a corporate entity, and to situations involving reconstruction or demolition of the entire "terminal building" in which the leased premises were located, as compared with reconstruction or demolition "of that portion of the building" of which the leased premises were a part.

Verified Complaint ¶ 11, at 5–6.

Arguing that Amtrak's purported terminations were entirely inadmissable under the express terms agreed to by the parties, Horn & Hardart sought a declaration that the terminations were unlawful, an injunction prohibiting Amtrak from seeking to evict or otherwise remove Horn & Hardart from the premises, and compensatory damages of not less than $2.5 million.

Amtrak promptly moved to dismiss the complaint or, alternatively, for summary judgment. Inasmuch as Amtrak submitted evidence outside the pleadings, the District Court treated the motion as falling into the latter category, see Fed.R.Civ.P. 12(b)(6). The court ruled in favor of Amtrak, concluding, in brief, that the operative words of the termination clause, namely "require[d] . . . for Corporate purposes" were

unambiguous and thus amendable to authoritative judicial construction. As to the term "require," the court determined that "[b]oth the plain meaning of the word ["require"] as used in the leases and case law supports Amtrak's position." Memorandum Opinion at 6. In so concluding, the trial court rejected Horn & Hardart's argument that, as evidenced by the Declaration of one of its officers who had conducted the lease negotiations on behalf of the Company, the term "require" was substituted for the term "desire" in order "to reflect the fact that the leases could be terminated only if termination was mandatory or indispensible." *Id.* at 8. *See* Horn & Hardart's Opposition to Defendant's Motion to Dismiss at 12 ("[T]he Leases use 'require,' which in this context clearly means 'to demand as necessary or essential' or 'to make indispensable.'") (citation omitted). So too, the District Court eschewed the Company's interpretation of "Corporate purposes," which Horn & Hardart construed to mean "that Amtrak may take Horn & Hardart's space only when such space is indispensable for Amtrak's continued existence as an entity which provides 'intercity and commuter rail service.'" Opposition at 19 (citation omitted). In the trial court's view, this proffered construction was "unduly narrow." Memorandum Opinion at 8. Invoking "plain meaning," the court determined:

> [I]t is obvious that Amtrak's use of Horn and Hardart's space for expanding ticket counter and waiting room facilities is for Amtrak's corporate purposes of providing modern, cost-efficient, intercity passenger rail transportation service.

*Id.* at 9.

Looking to the uncontradicted evidence as to the use to which the leased premises would in fact be put, the court concluded that "Amtrak has the right to terminate the leases in order to expand its ticket counter and waiting area because Amtrak 'requires' the demised premises for its 'Corporate purposes.'" *Id.* at 9. In so doing, the court construed what it viewed as the critical term, "require," as "necessary or needed," not, as Horn & Hardart vigorously argued, "mandatory or indispensable." *Id.*

## II

On appeal, Horn & Hardart's principal argument is that the lease terms were infected by "patent ambiguity." Brief for Appellant at 10, thus rendering the contract dispute unsuitable for summary judgment. To compound this threshold legal error, the Company contends, the District Court's summary disposition resurrected Phoenix-like the sweeping, pro-Lessor termination clause that the parties, by virtue of Horn & Hardart's effective negotiation efforts, had discarded. That is to say, "[t]he trial court's interpretation is tantamount to construing the word 'require' to mean 'desire.'" *Id.* at 14. This fundamental legal error, the Company asserts, had the effect of cutting off, without warrant, the development of "relevant facts" through "essential discovery," *id.* at 15, all in derogation of the orderly procedures contemplated by the Federal Rules of Civil Procedure, especially Rule 56(f).

The Company suggests that the court below, remaining as it did on high legal ground instead of delving into the facts, ignored the incongruence of its legal pronouncements with the facts themselves. Such facts include facial alterations to the Arby's lease and Horn & Hardart's acceptance of Amtrak's sweeping termination clause in a contemporaneously executed lease for retail space (aside from the three leases at issue here). What is more, the Company argues, the pivotal term, "Corporate purposes," is not only ambiguous but is clearly less expansive than Amtrak's proffered interpretation, which would encompass any corporate activity that does not stray beyond the outer perimeter of the *ultra vires* doctrine. This extraordinary sweep, the Company maintains, could not possibly have been intended by the parties inasmuch as the parties in their negotiations modified the termination provision so as to substitute "Corporate purposes" for "transportation or public service purposes." Taken together, the pro-Horn &

Hardart modifications to the lease provisions were meant, as the Company sees it, to restrict Amtrak's right to terminate. The District Court's pre-trial disposition, Horn & Hardart argues, permits Amtrak unfairly to claim victory in the courthouse despite its defeat at the negotiating table.

To exacerbate matters, the Company goes on, Amtrak is thereby permitted to effect a forfeiture of Horn & Hardart's valuable leasehold interests, a result disfavored by the more merciful principles animating courts of justice in construing contracts. Finally, in Horn & Hardart's view, the District Court's interpretation has rendered surplusage the "re-construction" provision in the termination clause, which limits Amtrak's right to abrogate the leases to when the *terminal building*—not just the *portion* of the building of which the leased premises are a part—is reconstructed.

### III

■ Notwithstanding the able arguments of counsel for the Company, we find ourselves in full agreement with the District Court's pivotal determination that the contract language is properly amenable to dispositive interpretation as a matter of law. Consistent with applicable law, *see, e.g., Clayman v. Goodman Properties, Inc.*, 518 F.2d 1026, 1034 (D.C.Cir.1974), the District Court turned to the language of the contract itself to determine whether the provision was ambiguous. As the District Court rightly said, the construction of *unambiguous* contractual language is a matter of law entrusted to the court. *Washington Metropolitan Area Transit Authority v. Mergentime Corporation*, 626 F.2d 959, 961 (D.C.Cir.1980). The issue, then, is whether the language that has so sharply divided the parties is, in truth, *reasonably* susceptible of different construction or interpretations. *Papago Tribal Utility Authority v. FERC*, 723 F.2d 950, 955 (D.C.Cir.1983), *cert. denied*, 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984).

■ We conclude that the District Court's interpretation of the language, based upon its plain meaning, is unimpeachable. Horn & Hardart's construction of the contract, whether it is based on the term "corporate purpose" alone or on the juxtaposition of the terms "require" and "corporate purpose," is not yielded by a fair examination of the language itself. The sole interpretation advanced by the Company before the District Court and on appeal is, as we have seen, that Amtrak can lawfully trigger the clause "only if termination was mandatory or indispensible" for Amtrak's corporate purposes. Opposition at 8; *see also* Reply Brief for Appellant at 4–5. This is a reading to which the actual language does not reasonably admit. Corporate life and death does not have to be on the line to "require [space] ... for Corporate purposes." We concur fully with the able District Judge's view that the Company's strained interpretation "would render the termination provision virtually useless and would be inconsistent with Amtrak's mandate from Congress to provide modern, efficient, rail passenger service." Memorandum Opinion at 6.

Contrary to Horn & Hardart's assertions, our rejection of its corporate life-and-death standard does not render the termination provision operable at the whim of the landlord. The undisputed evidence shows that Amtrak did not terminate the Company's lease in order to secure a more lucrative leasehold arrangement. Rather, Amtrak, pursuant to a broad plan of substantial improvements to Penn Station, sought to employ the precise space occupied by Horn & Hardart for expanded ticket counter space and other, non-leasehold purposes. Those specific purposes, under the undisputed facts presented here, suffice to bring the lessor's reason for termination within the plain meaning of the lease's termination provision. That the use of the demised premises by Amtrak in this instance is "reasonably necessary" to give life to one of its general corporate purposes is further supported by Horn & Hardart's acknowledgment that Amtrak could have terminated the leases pursuant to the leases' condemnation clause, a provision which

incorporates Amtrak's right to acquire or take property when "required for intercity rail passenger service." 45 U.S.C. § 545(d)(1) (1982).

■ Horn & Hardart's remaining concerns need not detain us. There is, fairly viewed, no "forfeiture" at work here since the leases either did (Arby's) or could have contained a cancellation premium clause. Indeed, pursuant to the Arby's cancellation premium clause, Horn & Hardart in August 1985 received $180,000 from Amtrak; what is more, the original 1967 lease likewise contained a cancellation premium clause. The disincentive of a cancellation premium clause constituted the specific protective mechanism to which the parties agreed.

We are similarly unpersuaded that the District Court's reading of Part 1 of the termination clause ("require ... for Corporate purposes") renders surplusage the provisions of Part 2 of the clause ("re-construction"). The clauses do indeed overlap in this particular setting, but overlap in one situation cannot properly be equated with the unhappy condition of "surplusage." For it appears to us that the latter Part—the "reconstruction" portion of the clause—may have efficacy in other settings, such as where reconstruction might be forced on Amtrak by, say, Madison Square Garden which sits atop the subterranean provinces of Penn Station.

Finally, we observe merely in passing that the acceptance of Horn & Hardart's plea that this case move beyond the summary-judgment station and onto the tracks of discovery and trial would likely lead to a highly extensive factual undertaking as to the "indispensability" of the substantial improvements project now underway and approved by the Amtrak board of directors. The unlikelihood that the parties contemplated such a result fortifies us in our conclusion, reached independently for the reasons heretofore stated, that the plain language of this provision reasonably admits only of the construction discerned by the District Court.

*Affirmed.*

J. SKELLY WRIGHT, Senior Circuit Judge, dissenting:

I am unable to agree with the majority that the contract in dispute in this case is so unambiguous as to admit of only one reasonable construction. Accordingly, I respectfully dissent.

As an initial matter I note that this case does not present us with the issue whether Amtrak may evict its tenant Horn & Hardart. Indeed, Horn & Hardart has already been displaced. Rather, the issue is the extent to which Amtrak is liable to Horn & Hardart for damages resulting from the already-completed eviction.

In the usual case when a landlord evicts his tenant in violation of a lease he assumes the burden of compensating his tenant for the breach. The parties, of course, may alter this arrangement either by allowing the landlord to evict the tenant *without* violating the lease or by providing that the landlord may evict the tenant without liability in only a narrow range of circumstances. In this case Horn & Hardart argues that the parties agreed to the latter, allowing Amtrak to terminate the lease only in a very narrow range of circumstances. This does *not* mean that unless those circumstances are met Amtrak is burdened with the presence of Horn & Hardart's restaurants. Amtrak may proceed either through its condemnation power or, as in this case, through an arguable violation of the lease to rid itself of its unwanted tenant. In either case Amtrak must pay damages to its tenant. But surely *that* is not such an unreasonable result; landlords and tenants often agree to be bound in leases without termination clauses.

Horn & Hardart does not rest its case on a reading of the term "Corporate purpose" alone. Indeed, it specifically acknowledged both in the trial court and on appeal that the term "Corporate purpose" might, in the abstract, include the proposed renovation. *See* Transcript of Proceedings (April 29, 1985) at 34–35; Reply Brief for Appellant at 2–3. Rather it argues that *regardless* of

the scope of the term "Corporate purpose" the court must examine the nexus between that purpose and the termination of Horn & Hardart's leases. *See* Reply Brief for Appellant at 2–3 ("Whether termination of Horn & Hardart's leases is *'required'* for Amtrak's 'Corporate purposes,' however, is a wholly separate issue, and one that greatly restricts Amtrak's right to terminate.") (emphasis in original).

The District Court and the majority find that "required" means "reasonably necessary." Although I wholly agree that the "reasonably necessary" construction of the challenged contract clause *might* reflect the intent of the parties to this contract, I am unable to agree that this construction represents the only possible reasonable construction of the contract. As Horn & Hardart argues, this clause might also mean that Amtrak may only terminate the lease when use of the space is *required* for a permissible corporate purpose. The majority's construction of this contract requires this court to assume that Horn & Hardart entered into this long-term contract, made large investments protected only by limited cancellation premium clauses, and left itself open to eviction whenever Amtrak decided that the use of the space was "reasonably necessary" for its general purposes. Although Horn & Hardart might have agreed to such a contractual relationship, it is by no means clear to me that it did not intend, through the use of the word "require," to place more stringent limitations upon the right of termination. Certainly I would not reach such a conclusion without consideration of extrinsic evidence bearing on the intent of the parties. Moreover, I note that "require" and "reasonably necessary" are hardly synonyms. Had the parties intended the contract to allow termination whenever Amtrak found it "reasonably necessary" to further one of its corporate purposes, they could easily have incorporated such language. Thus, because the contract is reasonably susceptible of different reasonable interpretations, I would hold that summary judgment was inappropriate and would remand this case for trial. *See Papago Tribal Utility Au-*

*thority v. FERC,* 723 F.2d 950, 955 (D.C. Cir.1983), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984).

Because the majority reaches the opposite result, I respectfully dissent.