Justice Stevens, with whom Justice Souter joins,
dissenting.
The basic question presented by these complicated cases is whether “the Federal Energy Regulatory Commission *556 (FERC or Commission) must presume that the rate set out in a freely negotiated wholesale-energy contract meets the 'just and reasonable’ requirement imposed by law.” Ante, at 530. The opening sentence of the Court’s opinion tells us that the “Mobile-Sierra doctrine”—a term that makes its first appearance in the United States Reports today — mandates an affirmative answer. This holding finds no support in either case that lends its name to the doctrine. Nevertheless, in the interest of guarding against “disfigurement of the venerable Mobile-Sierra doctrine,” ante, at 548, the Court mangles both the governing statute and precedent.
I
Under the Federal Power Act (FPA), 41 Stat. 1063, 16 U. S. C. § 791a et seq., wholesale electricity prices are established in the first instance by public utilities, either via tariffs or in contracts with purchasers. § 824d(c). Whether set by tariff or contract, all rates must be filed with the Commission. See ibid. Section 205(a) of the FPA provides, “All rates and charges . . . shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.” 16 U. S. C. § 824d(a). Pursuant to § 206(a), if FERC determines “that any rate ... or that any rule, regulation, practice, or contract affect[ing] such rate ... is unjust [or] unreasonable ..., the Commission shall determine the just and reasonable rate,. . . rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.” 16 U. S. C. § 824e(a) (2000 ed., Supp. V). These provisions distinguish between the ratesetting roles of utilities (which initially set rates) and the Commission (which may override utility-set rates that are not just and reasonable), but they do not distinguish between rates set unilaterally by tariff and rates set bilaterally by contract. However the utility sets its prices, the standard of review is the same—rates must be just and reasonable.
*557 The Court purports to acknowledge that “[t]here is only one statutory standard for assessing wholesale-electricity rates, whether set by contract or tariff — the just-and-reasonable standard.” Ante, at 545. Unlike rates set by tariff, however, the Court holds that any “freely negotiated” contract rate is presumptively just and reasonable unless it “seriously harms” the public interest. Ante, at 530. According to the Court, this presumption represents a “differing application of [the] just-and-reasonable standard,” but not a different standard altogether. Ante, at 535. I disagree. There is no significant difference between requiring a heightened showing to overcome an otherwise conclusive presumption and imposing a heightened standard of review. I agree that applying a separate standard of review to contract rates is “obviously indefensible,” ibid., but that is also true with respect to the Court’s presumption.
Even if the “Mobile-Sierra presumption” were not tantamount to a separate standard, nothing in the statute mandates “differing application” of the statutory standard to rates set by contract. Ibid. Section 206(a) of the FPA provides, “without qualification or exception,” that FERC may replace any unjust or unreasonable contract with a lawful contract. Permian Basin Area Rate Cases, 390 U. S. 747, 783-784 (1968) (construing identical language in the Natural Gas Act, 15 U. S. C. § 717d(a)). The statute does not say anything about a mandatory presumption for contracts, much less define the burden of proof for overcoming it or delineate the circumstances for its nonapplication. Cf. ante, at 530, 547-548. Nor does the statute prohibit FERC from considering marginal cost when reviewing rates set by contract. Cf. ante, at 549-551, and n. 5.
If Congress had intended to impose such detailed constraints on the Commission’s authority to review contract rates, it would have done so itself in the FPA. Congress instead used the general words “just and reasonable” because it wanted to give FERC, not the courts, wide latitude *558 in setting policy. As we explained in Chevron U S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 843-844 (1984):
“ ‘The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.’ Morton v. Ruiz, 415 U. S. 199, 231 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.” (Footnote omitted.)
Consistent with this understanding of administrative law, our cases interpreting the FPA have invariably “emphasized that courts are without authority to set aside any rate adopted by the Commission-which is within a ‘zone of reasonableness.’” Permian Basin, 390 U. S., at 797. But see ante, at 548 (asserting that “a ‘zone of reasonableness’ test . . . fails to accord an adequate level of protection to contracts”). This deference makes eminent sense because “rate-making agencies are not bound to the service of any single regulatory formula; they are permitted, unless their statutory authority otherwise plainly indicates, ‘to make the pragmatic adjustments which may be called for by particular circumstances.’” Permian Basin, 390 U. S., at 776-777. Despite paying lipservice to this principle, see ante, at 532, the Court binds the Commission to a rigid formula of the Court’s own making.
*559 Having found no statutory text that supports its vision of the Mobile-Sierra doctrine, the Court invokes the “important role of contracts in the FPA.” Ante, at 551. But contracts play an “important role” in the FPA only insofar as the statute “departed from the scheme of purely tariff-based regulation.” Verizon Communications Inc. v. FCC, 535 U. S. 467, 479 (2002). In allowing parties to establish rates by contract, Congress did not intend to immunize such rates from just-and-reasonable review. Both United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U. S. 332 (1956), and FPC v. Sierra Pacific Power Co., 350 U. S. 348 (1956), the supposed progenitors of the “Mobile-Sierra presumption,” make this point in no uncertain terms. See id., at 353 (“The Commission has undoubted power under § 206(a) to prescribe a change in contract rates whenever it determines such rates to be unlawful”); Mobile, 350 U. S., at 344 (“[Contracts remain fully subject to the paramount power of the Commission to modify them when necessary in the public interest”).[1] Accordingly, the fact that the FPA tolerates contracts does not make it subservient to contracts.
II
Neither of the eponymous cases in the “Mobile-Sierra presumption,” nor any of our subsequent decisions, substantiates the Court’s atextual reading of §§ 205 and 206.
As the Court acknowledges, Mobile itself says nothing about what standard of review applies to rates established by contract. See ante, at 532-533. Rather, Mobile merely held that utilities cannot unilaterally abrogate contracts with *560 purchasers by filing new rate schedules with the Commission. See 350 U. S., at 339-341. The Court neglects to mention, however, that although Mobile had no occasion to comment on the standard of review, it did imply that Congress would not have permitted parties to establish rates by contract but for “the protection of the public interest being afforded by supervision of the individual contracts, which to that end must be filed with the Commission and made public.” Id., at 339.
In Sierra, a public utility entered into a long-term contract to sell electricity “at a special low rate” in order to forestall potential competition. See 350 U. S., at 351-352. Several years later the utility complained that the rate provided too little profit and was therefore not “just and reasonable.” The Commission agreed and set aside the rate “solely because it yield[ed] less than a fair return on the net invested capital.” See id., at 354-355. The Court vacated and remanded on the ground that the Commission had applied an erroneous standard. “[W]hile it may be that the Commission may not normally impose upon a public utility a rate which would produce less than a fair return,” the Court reasoned, “it does not follow that the public utility may not itself agree by contract to a rate affording less than a fair return or that, if it does so, it is entitled to be relieved of its improvident bargain.” Id., at 355. When the seller has agreed to a rate that it later challenges as too low, “the sole concern of the Commission would seem to be whether the rate is so low as to adversely affect the public interest — as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory.” Ibid. The Court further elaborated on what it meant by the “public interest”:
“That the purpose of the power given the Commission by § 206(a) is the protection of the public interest, as distinguished from the private interests of the utilities, is evidenced by the recital in §201 of the Act that the *561 scheme of regulation imposed ‘is necessary in the public interest.’ When § 206(a) is read in the light of this purpose, it is clear that a contract may not be said to be either ‘unjust’ or ‘unreasonable’ simply because it is unprofitable to the public utility.” Ibid.
Sierra therefore held that, in accordance with the statement of policy in the FPA, 16 U. S. C. § 824(a), whether a rate is “just and reasonable” is measured against the public interest, not the private interests of regulated sellers. Contrary to the opinion of the Court, see ante, at 551-552, n. 6, Sierra instructs that the public interest is the touchstone for just-and-reasonable review of all rates, not just contract rates. Sierra drew a distinction between the Commission’s authority to impose low rates on utilities and its authority to abrogate low rates agreed to by utilities because these actions impact the public interest differently, not because the public interest governs rates set bilaterally but not rates set unilaterally. When the Commission imposes rates that afford less than a fair return, it compromises the public’s interest in attracting necessary capital. The impact is different, however, if a utility has agreed to a low rate because investors recognize that the utility, not the regulator, is responsible for the unattractive rate of return.
Sierra used “public interest” as shorthand for the interest of consumers in paying “the ‘lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest.’ ” Permian Basin, 390 U. S., at 793 (quoting Atlantic Refining Co. v. Public Serv. Comm’n of N. Y, 360 U. S. 378, 388 (1959)). Whereas high rates directly implicate this interest, low rates do so only indirectly, such as when the rate is so low that it “might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory.” Sierra, 350 U. S., at 355. Nothing in Sierra purports to mandate a “serious harm” standard of review, or to require any assumption that high rates and low rates impose *562 symmetric burdens on the public interest. As we later explained in FPC v. Texaco Inc., 417 U. S. 380, 399 (1974), the Commission cannot ignore even “a small dent in the consumer’s pocket” because “the Act makes unlawful all rates which are not just and reasonable, and does not say a little unlawfulness is permitted.”
Brushing aside the text of the FPA, as well as the holdings in Mobile and Sierra themselves, the Court cherry picks language from Verizon, Arkla, and Permian Basin. Both Verizon and Arkla mentioned the Mobile-Sierra line of cases only in passing, and neither case had anything to do with just-and-reasonable review of rates. See Verizon, 535 U. S., at 479; Arkla, 453 U. S. 571, 582 (1981). Furthermore, the statement in Permian Basin about “unequivocal public necessity,” 390 U. S., at 822, speaks to the difficulty of establishing injury to the public interest in the context of a low-rate challenge, not a high-rate challenge.[2] The Court’s reliance *563 on these few stray sentences calls to mind our admonishment in Permian Basin: “The Commission’s exercise of its regulatory authority must be assessed in light of its purposes and consequences, and not by references to isolated phrases from previous cases.” Id., at 791, n. 60.
Ill
Lacking any grounding in the FPA or precedent, the Court concludes, as a matter of policy, that the Mobile-Sierra presumption is necessary to ensure stability in volatile energy markets and to reduce regulatory costs. See ante, at 551. Of course, “the desirability of fostering market-stabilizing long-term contracts,” ante, at 553, plays into the public interest insofar as the “Commission’s responsibilities include the protection of future, as well as present, consumer interests,” Permian Basin, 390 U. S., at 798; see also United Gas Pipe Line Co. v. Memphis Light, Gas and Water Div., 358 U. S. 103, 113 (1958) (“It seems plain that Congress . . . was not only expressing its conviction that the public interest requires the protection of consumers from excessive prices for natural gas, but was also manifesting its concern for the legitimate interests of natural gas companies in whose financial stability the gas-consuming public has a vital stake”). But under the FPA, Congress has charged FERC, not the courts, with balancing the short-term and long-term interests of consumers. See Permian Basin, 390 U. S., at 792 (“The court’s responsibility is not to supplant the Commission’s balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors”).
Moreover, not even FERC has the authority to endorse the rule announced by the Court today. The FPA does not indulge, much less require, a “practically insurmountable” *564 presumption, see Papago Tribal Util. Auth. v. FERC, 723 F. 2d 950, 954 (CADC 1983) (opinion for the court by Scalia, J.), that all rates set by contract comport with the public interest and are therefore just and reasonable. Congress enacted the FPA precisely because it concluded that regulation was necessary to protect consumers from deficient markets. It follows, then, that “the Commission lacks the authority to place exclusive reliance on market prices.” Texaco, 417 U. S., at 400; see also id., at 399 (“In subjecting producers to regulation because of anticompetitive conditions in the industry, Congress could not have assumed that ‘just and reasonable’ rates could conclusively be determined by reference to market price”). For this reason, we have already rejected the policy rationale proffered by the Court today:
“It may be, as some economists have persuasively argued, that the assumptions of the 1930’s about the competitive structure of the natural gas industry, if true then, are no longer true today. It may also be that control of prices in this industry, in a time of shortage, if such there be, is counterproductive to the interests of the consumer in increasing the production of natural gas. It is not the Court’s role, however, to overturn congressional assumptions embedded into the framework of regulation established by the Act. This is a proper task for the Legislature where the public interest may be considered from the multifaceted points of view of the representational process.” Id., at 400 (footnote omitted).
Balancing the short-term and long-term interests of consumers entails difficult judgment calls, and to the extent FERC actually engages in this balancing, its reasoned determination is entitled to deference. But FERC cannot abdicate its statutory responsibility to ensure just and reasonable rates through the expedient of a heavyhanded presumption. *565 This is not to say that the Commission should abrogate any contract that increases rates, but to underscore that the agency is “obliged at each step of its regulatory process to assess the requirements of the broad public interests entrusted to its protection by Congress.” Permian Basin, 390 U. S., at 791.
IV
Even if, as the Court holds today, the “Mobile-Sierra presumption” is merely a “differing application” of the statutory just-and-reasonable standard, FERC’s orders must be set aside because they were not decided on this basis.
The FERC orders repeatedly aver that the agency is applying a “public interest” standard different from and distinctly more demanding than the statutory standard. See, e. g., App. 1198a (“[T]he burden of showing that a contract is contrary to the public interest is a higher burden than showing that a contract is not just and reasonable. . . . The fact that a contract may be found to be unjust and unreasonable under [§§205 and 206] does not in and of itself demonstrate that the contract is contrary to the public interest under the Supreme Court cases”). Indeed, the Commission’s misunderstanding of our cases is so egregious that the sellers, concerned that the orders would be overturned, asked the Commission for “clarification that the public interest standard of review does not authorize unjust and unreasonable rates.” Id., at 1506a, 1567a. FERC clarified as follows:
“[I]f rates . . . become unjust and unreasonable and the contract at issue is subject to the Mobile-Sierra standard of review, the Commission under court precedent may not change the contract simply because it is no longer just and reasonable. If parties’ market-based rate contracts provide for the public interest standard of review, the Commission is bound to a higher burden to support modification of such contracts.” Id., at 1506a, 1567a.
*566 Whereas in Texaco we faulted the Commission for failing to “expressly mention the just-and-reasonable standard,” 417 U. S., at 396, in these cases FERC refused outright to apply that standard.[3]
In addition to misrepresenting FERC’s understanding of the Mobile-Sierra doctrine as a presumption rather than a separate standard, the Court overstates the extent to which FERC considered the lawfulness of the rates. The Court recognizes, as it must, that the three factors identified in Sierra are neither exclusive nor “precisely applicable to the high-rate challenge of a purchaser.” See ante, at 548; Brief for Respondent FERC 41-42. Although FERC applied what it termed the “Sierra Three-Prong Test,” App. 1276a, the Court contends the agency did not err because it also evaluated the “‘totality of [the] circumstances,’” see ante, at 549. But FERC’s totality-of-the-circumstances review was infected by its misapprehension of the standard “dictated by the U. S. Supreme Court under the Mobile-Sierra doctrine.” App. 1229a.
Whereas the focus of §§ 205(a) and 206(a) is on the reasonableness of the rates charged, not the conduct of the contracting parties, FERC restricted its review to the contracting parties’ behavior around the time of formation. See id., at 1280a-1284a. FERC seems to have thought it was powerless to conduct just-and-reasonable review unless the contract was already subject to abrogation based on contract defenses such as fraud or duress. By including contracts within the scope of § 206(a), however, Congress must have concluded that contract defenses are insufficient to protect the public interest. But see ante, at 547 (holding that the *567 “Mobile-Sierra presumption” applies in all circumstances absent “traditional grounds for . . . abrogation” or “illegal action” by a contracting party).[4] Indeed, nothing in the FPA or this Court’s cases precludes FERC from considering circumstances exogenous to contract negotiations, including natural disasters and market manipulation by entities not parties to the challenged contract.[5] FERC’s error is obvious from the face of the orders, which repeatedly state the Commission’s belief that it could not consider evidence relevant to the reasonableness of the contract rates.[6]
*568 Although the Court and the Commission attempt to recast FERC’s orders as applying the statutory standard, see ante, at 542-543; Brief for Respondent FERC 21, under the doctrine set forth in SEC v. Chenery Corp., 318 U. S. 80 (1943), “we cannot accept appellate counsel's post hoc rationalizations for agency action; for an agency’s order must be upheld, if at all, on the same basis articulated in the order by the agency itself,” Texaco, 417 U. S., at 397 (internal quotation marks omitted). Furthermore, even assuming FERC subjectively believed that it was applying the just-and-reasonable standard despite its repeated declarations to the contrary, each order must be deemed “so ambiguous that it falls short of that standard of clarity that administrative orders must exhibit.” Id., at 395-396.
In order to get around the Chenery doctrine, the Court not only mischaracterizes FERC’s orders, but also takes a more radical tack: It concludes that whatever the rationale set forth in FERC’s orders, Chenery does not apply because “the Commission was required, under our decision in Sierra, to apply the Mobile-Sierra presumption in its evaluation of the contracts here.” Ante, at 544-545. This point prompts the Court to comment that “FERC has lucked out.” Ante, at 544. If the Commission has “lucked out,” it is not only a purely fortuitous victory, but also a Pyrrhic one. Although FERC prevails in these cases despite having “offered a justification in court different from what it provided in its opinion,” ibid., it has paid a tremendous price. The Court has curtailed the agency’s authority to interpret the terms “just and reasonable” and thereby substantially narrowed FERC’s discretion to protect the public interest by the means it thinks best. Contrary to congressional intent, FERC no *569 longer has the flexibility to adjust its review of contractual rates to account for changing conditions in the energy markets or among consumers. Cf. Permian Basin, 390 U. S., at 784 (“[Administrative authorities must be permitted, consistently with the obligations of due process, to adapt their rules and policies to the demands of changing circumstances”).
V
The decision of the Court of Appeals for the Ninth Circuit deserves praise for its efforts to bring the freewheeling Mobile-Sierra doctrine back in line with the FPA and this Court’s cases. I cannot endorse the opinion in its entirety, however, because it verges into the same sort of improper policymaking that I have criticized in the Court’s opinion. Both decisions would hobble the Commission, albeit from different sides. Congress has not authorized courts to prescribe energy policy by imposing presumptions or prerequisites, or by making marginal cost the sole concern or no concern at all. I would therefore vacate and remand the cases in order to give the Commission an opportunity to evaluate the contract rates in light of a proper understanding of its discretion.
I respectfully dissent.

 See also, e. g., Arkansas Louisiana Gas Co. v. Hall, 453 U. S. 571, 582 (1981) (Arkla) (“[T]he clear purpose of the congressional scheme” for rate filing is to “gran[t] the Commission an opportunity in every case to judge the reasonableness of the rate”); Permian Basin Area Rate Cases, 390 U. S. 747, 784 (1968) (“[T]he Commission has plenary authority to limit or to proscribe contractual arrangements that contravene the relevant public interests”).

 The Court repeatedly quotes the following snippet from the 75-page opinion in Permian Basin: “The regulatory system created by the Act is premised on contractual agreements voluntarily devised by the regulated companies; it contemplates abrogation of these agreements only in circumstances of unequivocal public necessity.” 890 U. S., at 822 (cited ante, at 534, 550, 553). Like FPC v. Sierra Pacific Power Co., 350 U. S. 348 (1956), however, Permian Basin made this statement in the course of rejecting a low-rate challenge. Read in context, the Court’s reference to “unequivocal public necessity” is a loose restatement of Sierra, which required “evidence of injury to the public interest,” and which underscored how rarely a utility will be able to demonstrate that a “contract price is so ‘low as to adversely affect the public interest.’ ” 390 U. S., at 820-821 (quoting Sierra, 350 U. S., at 355). The Court’s expansive reading of the “unequivocal public necessity” statement cannot be squared with Permian Basin’s discussion of the Commission’s authority to review rates set by contract: “Although the Natural Gas Act is premised upon a continuing system of private contracting, the Commission has plenary authority to limit or to proscribe contractual arrangements that contravene the relevant public interests.” 390 U. S., at 784 (citation omitted). Nor can it be reconciled with Permian Basin’s rejection of the producers’ arguments (1) that the Commission “wrongly invalidated existing contracts” by imposing a ceiling on rates, see id., at 781-784, and (2) that the Commission was compelled *563 to adopt contract prices as the basis for computing area rates, see id., at 792-795.

 The Court contends that FERC’s application of the Mobile-Sierra doctrine “should be honored” because it represents the “settled understanding of the FPA.” Ante, at 552, n. 6. As explained above, however, FERC’s interpretation of the FPA (and of our cases construing the FPA) is “‘obviously indefensible,”’ supra, at 557 (quoting ante, at 535), and is therefore not entitled to any deference.

 The Court quite sensibly instructs FERC that “if it is clear that one party to a contract engaged in such extensive unlawful market manipulation as to alter the playing field for contract negotiations, the Commission should not presume that the contract is just and reasonable”; and that the “mere fact that the unlawful activity occurred in a different (but related) market does not automatically establish that it had no effect upon the contract — especially given the Staff Report’s (unsurprising) finding that high prices in the one market produced high prices in the other.” Ante, at 554. I disagree, however, with the Court’s suggestion that the FPA restricts FERC’s review of contract rates to these limited criteria.

 The FPA does not specify how market deficiencies should weigh in FERC’s review of contract rates. Depending on the circumstances and how one balances the short-term and long-term interests of consumers, evidence of “market turmoil” may, as the Court argues, support rather than detract from a finding that contract rates are just and reasonable. See ante, at 547. Whether any given contract rate “ultimately benefits consumers,” ante, at 551, however, is a determination that Congress has vested in FERC, not this Court.

 See, e. g., App. 1275a (“[A] finding that the unjust and unreasonable spot market prices caused forward bilateral prices to be unjust and unreasonable would be relevant to contract modification only where there is a ‘just and reasonable’ standard of review. As we have previously concluded, the contracts at issue in this proceeding do not provide for such a standard but rather evidence an intent that the contracts may be changed only pursuant to the ‘public interest’ standard of review. Under the ‘public interest’ standard, to justify contract modification it is not enough to show that forward prices became unjust and unreasonable due to the impact of spot market dysfunctions” (footnote omitted)); id., at 1527a (“Complainants were required to meet the public interest standard of review, not the just and reasonable standard of review which could have taken *568 into account the causal connection between the spot market prices and forward bilateral market prices”); id,., at 1534a (“The Staff Report did not make any findings regarding the justness and reasonableness of any contract rates and any such findings would not be relevant here because the just and reasonable standard is not applicable”).