USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  FOR THE FIRST CIRCUIT ____________________ No. 94-1948 NORTHEAST UTILITIES SERVICE COMPANY, Petitioner, v. FEDERAL ENERGY REGULATORY COMMISSION, Respondent. ____________________ ON PETITION FOR REVIEW OF ORDER OF THE FEDERAL ENERGY REGULATORY COMMISSION ____________________ Before Torruella, Chief Judge, ___________ Bownes, Senior Circuit Judge, ____________________ and Selya, Circuit Judge. _____________ ____________________ J.A. Bouknight, Jr., with whom David B. Raskin, Edward J. Twomey, ___________________ ________________ ________________ Newman, Bouknight & Edgar, P.C., and Frederic Lee Klein, Assistant ________________________________ ___________________ General Counsel, Northeast Utilities Service Company, were on brief for petitioner. Randolph Lee Elliott, Attorney, with whom Susan Tomasky, General ____________________ _____________ Counsel, and Jerome M. Feit, Solicitor, Federal Energy Regulatory ________________ Commission, were on brief for respondent. ____________________ May 23, 1995 ____________________ BOWNES, Senior Circuit Judge. The main issue in BOWNES, Senior Circuit Judge. _____________________ this case is whether the Federal Energy Regulatory Commission (FERC) complied with our mandate in Northeast Utilities ___________________ Service Co. v. FERC, 993 F.2d 937 (1st Cir. 1993) (Northeast ____________ ____ _________ I) and applied the "public interest" test in ordering the _ modification of a wholesale electric power contract. In Northeast I we upheld FERC's decision ____________ conditionally approving the merger of Northeast Utilities (NU) and the Public Service Company of New Hampshire (PSNH). Before us also was the objection of Northeast Utilities Service Company (NUSCO) to the Commission's modification of the rate schedules filed by NUSCO. The rate schedules were part of a wholesale electric power contract (the Seabrook Power Contract) among NU, PSNH and the State of New Hampshire. Under the contract each party waived its right to file a complaint under 206(a) of the Federal Power Act (FPA) concerning the specified rates. Each party also agreed "that in any proceeding by the FERC under Section 206 the FERC shall not change the rate charged under this Agreement unless such rate is found to be contrary to the public interest." FERC was not a party to the contract. Section 206(a) of the FPA, 16 U.S.C. 824(e) provides: Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, -2- 2 observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Invoking its power under 206(a), the Commission examined the terms and conditions of the Seabrook Power contract. FERC found that the contract might unduly discriminate against entities not parties to it and that there was no genuine arms-length bargaining because the agreement was negotiated at a time when NU and PSNH were about to merge and assume identical interests. It ordered NUSCO to make three changes in the contract to bring it within the "just and reasonable" standard of 206(a): (1) delete the automatically adjusting rate-of-return-on-equity provision; (2) reduce the current rate-of-return-on-equity used to derive the rate for Seabrook power; and (3) submit for Commission review an initial estimate of the cost of decommissioning the Seabrook Power Plant, which is an atomic energy facility. The reduction order (2) on the current rate of return in equity was not appealed. After summarizing the Mobile-Sierra "public _____________ interest" doctrine as explicated in Papago Tribal Authority ________________________ -3- 3 v. FERC, 723 F.2d 950, 953 (D.C. Cir. 1983), cert. denied, ____ _____ ______ 467 U.S. 1241 (1984), we quoted the holding of the Commission that it had authority under the public interest standard to modify a contract where: it __ may be unjust, unreasonable, unduly ________________________________ discriminatory or preferential to the detriment of purchasers that are not parties to the contract; it is not the _______________ result of arm's length bargaining; or it _________________________________________ reflects circumstances where the seller _________________________________________ has exercised market power over the _________________________________________ purchaser. __________ Northeast I, 993 F.2d at 961. We also pointed out the ____________ interpretation given to the holding by the Administrative Law Judge ("ALJ"): The Commission made clear that in the particular circumstances surrounding the Seabrook contract, it retains power-- through the "public interest" language-- to make modifications under the traditional just and reasonable and nondiscrimination standards. Id. ___ We found that the standard enunciated by the Commission and applied by the ALJ, "conflates the 'just and reasonable' and 'public interest' standards, thereby circumventing the Mobile-Sierra doctrine." Id. We stated _____________ ___ that the Commission was bound to follow the Mobile-Sierra doctrine as explicated by _____________ Papago, and therefore should have ______ evaluated the SPC under the public interest standard, not the just and reasonable standard. -4- 4 Id. We remanded the issue "for reconsideration by FERC under ___ the public interest standard." Id. at 962. ___ It is FERC's position that on remand it reconsidered its previously ordered modifications of the Seabrook Power contract under the public interest standard and affirmed the orders previously issued under that standard. NUSCO contends that FERC did not comply with our mandate but instead created a wholly new version of the public interest standard which is more flexible and less stringent than the judicially adopted public interest standard. Standard of Review Standard of Review __________________ Not surprisingly, the parties differ on the standard of review to be followed. FERC urges that we follow the same deferential standard as we did in our prior case: On review, we give great deference to the Commission's decision. U.S. Dep't of ______________ Interior v. FERC, 952 F.2d 538, 543 (D.C. ________ ____ Cir. 1992). FERC's findings of fact are reviewed under the "substantial evidence" standard of review. 16 U.S.C. 825l ("The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive."). . . . . "Pure" legal errors require no deference to agency expertise, and are reviewed de __ novo. Questions involving an ____ interpretation of the FPA involve a de __ novo determination by the court of ____ Congressional intent; if that intent is -5- 5 ambiguous, FERC's conclusion will only be rejected if it is unreasonable. Chevron _______ USA v. Natural Resources Defense Council, ___ _________________________________ 467 U.S. 837, 842-56, 104 S. Ct. 2778, 2781-83, 81 L.Ed. 2d 694 (1984); Boston ______ Edison Co. v. FERC, 856 F.2d 361, 363 ___________ ____ (1st Cir. 1988). Northeast I, 993 F.2d at 943-44. ___________ NUSCO, on the other hand, plumps for the "law of the case" doctrine, arguing that we issued a mandate that had to be strictly construed and followed. In this circuit the "law of the case" doctrine has not been construed as an inflexible straitjacket that invariably requires rigid compliance with the terms of the mandate. In United States v. Connell, 6 F.3d 27, 31 (1st _____________ _______ Cir. 1993), we noted: To be sure, neither the law of the case doctrine nor its kissing cousin, the so- called "mandate rule," is designed to function as a straitjacket. Rather, these are discretion-guiding principles, generally thought to be subject to exceptions in the interests of justice. So also we said in United States v. Bell, 988 F.2d 247, 251 _____________ ____ (1st Cir. 1993): After all, the so-called "mandate rule," generally requiring conformity with the commands of a superior court on remand, is simply a specific application of the law of the case doctrine and, as such, is a discretion-guiding rule subject to an occasional exception in the interests of justice. In Doe v. Anrig, 728 F.2d 30, 31 (1st Cir. 1984), ___ _____ Justice Breyer, then circuit judge, reached back to Judge -6- 6 Learned Hand and Justice Holmes for an explanation of the meaning of the law of the case doctrine: That doctrine "does not rigidly bind a court to its former decisions, but is only addressed to its good sense." Higgins v. California Prune & Apricot _______ ____________________________ Grower, Inc., 3 F.2d 896, 898 (2d Cir. ____________ 1924) (L. Hand, J.). See Messenger v. ___ _________ Anderson, 225 U.S. 436, 444, 32 S. Ct. ________ 739, 740, 56 L. Ed. 1152 (1912) (Holmes, J.) ("the phrase, law of the case, as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power"). (Other citations omitted.) Under the circumstances, we will review the actions of FERC under the usual deferential standard, but always keeping in mind the restraints imposed on FERC by the terms of our mandate and the "law of the case" doctrine. The Case Law The Case Law ____________ We think it necessary to revisit the Mobile-Sierra _____________ doctrine, which represents the Supreme Court's attempt to strike a balance between private contractual rights and the regulatory power to modify contracts when necessary to protect the public interest. We start with United Gas Co. v. ______________ Mobile Gas Corp., 350 U.S. 332 (1956). The issue in Mobile ________________ ______ was, "whether under the Natural Gas Act . . . a regulated natural gas company furnishing gas to a distributing company under a long-term contract may, without the consent of the distributing company, change the rate specified in the -7- 7 contract simply by filing a new rate schedule with the Federal Power Commission." Id. at 333-34 (statutory citation ___ omitted). The facts can be summarized as follows. Mobile Gas Service (Mobile) was a distributor of natural gas to users (domestic and industrial) in Mobile, Alabama. Mobile obtained its gas from United Gas Co. (United). In 1946 the Ideal Cement Company (Ideal) decided to build a cement plant in the city if it could be assured gas supplied at a sufficiently low rate. Mobile agreed to supply Ideal with gas for ten years at 12 cents per MCF (thousand cubic feet). Before entering into the contract with Ideal, Mobile obtained from United a ten-year contract to supply gas to Mobile for resale to Ideal at the rate of 10.7 cents per MCF. This was a substantially lower rate than other gas furnished by United. This contract was filed with the Federal Power Commission and with its approval, became a part of United's filed schedule of rates and contracts. In June of 1953, United, without the consent of Mobile, filed new rate schedules with the Commission purporting to increase the rate on gas to be sold by Mobile to Ideal to 14.5 cents per MCF. Id. at 335-36. ___ The Court held that the Natural Gas Act did not give natural gas companies the right to change their rate contracts unilaterally. Id. at 337. The Court noted that ___ the Act "evinces no purpose to abrogate private rate -8- 8 contracts as such." Id. at 338. It pointed out that the ___ public interest was protected by the supervision of the individual rate contracts filed with the Commission. Id. at ___ 339. The Court explained its rationale as follows: Our conclusion that the Natural Gas Act does not empower natural gas companies unilaterally to change their contracts fully promotes the purposes of the Act. By preserving the integrity of contracts, it permits the stability of supply arrangements which all agree is essential to the health of the natural gas industry. Conversion by consumers, particularly industrial users, to the use of natural gas may frequently require substantial investments which the consumer would be unwilling to make without long-term commitments from the distributor, and the distributor can hardly make such commitments if its supply contracts are subject to unilateral change by the natural gas company whenever its interests so dictate. The history of the Ideal contract furnishes a case in point. On the other hand, denying to natural gas _______________________ companies the power unilaterally to _________________________________________ change their contracts in no way impairs _________________________________________ the regulatory powers of the Commission, _________________________________________ for the contracts remain fully subject to _________________________________________ the paramount power of the Commission to _________________________________________ modify them when necessary in the public _________________________________________ interest. The Act thus affords a ________ reasonable accommodation between the conflicting interests of contract stability on the one hand and public regulation on the other. Id. at 344 (emphasis added). ___ We make two observations. First, the obvious, that the facts of Mobile are quite different from those in the ______ case at bar. The issue here is not whether one party to a -9- 9 rate contract filed with FERC can effect a rate change unilaterally, but the standard to be used by FERC in examining electric power contracts filed with it. Our second observation is that nowhere in the Supreme Court opinion is the term "public interest" defined. Indeed, the Court seems to assume that the Commission decides what circumstances give rise to the public interest. We next examine the other leg of the Mobile-Sierra _____________ doctrine, FPC v. Sierra Pacific Power Co., 350 U.S. 348 ___ __________________________ (1956), which came down on the same day as Mobile and was ______ also written by Justice Harlan. In Sierra, the Court, for ______ the reasons given in Mobile, held that the filing of a new ______ rate by an electric power utility (Pacific Power Gas & Electric Company) and the finding of the Federal Power Commission that such new rate was not unlawful, could not change Pacific Gas' contract rate for supplying electricity to Sierra Pacific Power Co. Id. at 352-53. ___ The Court addressed a second question, not present in Mobile, which directly involved the "public interest" ______ doctrine. In its decision finding that the new rate was lawful, the Commission held that the old contract rate was unreasonable solely "because it yields less than a fair return on the net invested capital." Id. at 354-55. The ___ Court held: But, while it may be that the Commission may not normally impose upon a public ______ -10- 10 utility a rate which would produce less than a fair return, it does not follow that the public utility may not itself agree by contract to a rate affording less than a fair return or that, if it does so, it is entitled to be relieved of its improvident bargain. In such circum- _______________ stances the sole concern of the _________________________________________ Commission would seem to be whether the _________________________________________ rate is so low as to adversely affect the _________________________________________ public interest -- as where it might _________________________________________ impair the financial ability of the _________________________________________ public utility to continue its service, _________________________________________ cast upon other consumers an excessive _________________________________________ burden, or be unduly discriminatory. _________________________________________ That the purpose of the power given the Commission by 206(a) is the protection of the public interest, as distinguished from the private interests of the utilities, is evidenced by the recital in 201 of the Act that the scheme of regulation imposed "is necessary in the public interest." When 206 (a) is read in the light of this purpose, it is clear that a contract may not be said to be either "unjust" or "unreasonable" simply because it is unprofitable to the public utility. Id. at 355 (citation omitted) (emphasis added). ___ The holding of Sierra is clear; what justifies ______ protective action in the public interest by the Commission when it is considering whether a contract rate is too low is __________________________________________________________ where the rate might impair the financial ability of the utility to continue to supply electricity, force electricity consumers to bear an excessive burden, or be unduly discriminatory. This definition of what is necessary in the public interest was formulated in the context of a low-rate ________ case. It was not and could not be an across-the-board definition of what constitutes the public interest in other -11- 11 types of cases. One of the orders at issue in the case at bar is the submission by NUSCO to FERC of the cost of decommissioning the Seabrook Power Plant. The other order had to do with changing the rate of return-in-equity formula. Neither were low-rateissues inthe context ofMobile andSierra. ______ ______ The next case directly implicated in our remand order is Papago Tribal Authority v. FERC, 723 F.2d 950 (D.C. _______________________ ____ Cir. 1983), cert. denied, 467 U.S. 1241 (1984). This was _____ ______ also a low-rate case. The facts may be summarized as follows. The Commission approved an increase in electric rates paid to the Arizona Public Service Company. The Papago Tribal Utility Authority objected on the ground, inter alia, _____ ____ that its contract with Arizona did not permit unilaterally proposed rate changes under 205 of the Federal Power Act, 16 U.S.C. 824(d). Id. at 951-52. At issue was the ___ interpretation of the contract between Arizona and Papago and the authority of the Commission to modify it. The contract provided in pertinent part: The rates hereinabove set out in this Section 3 . . . are to remain in effect for the initial one (1) year of the term of this contract and thereafter unless and until changed by the Federal Power Commission or other lawful regulatory authority, with either party hereto to be free unilaterally to take appropriate action before the Federal Power Commission or other lawful regulatory authority in connection with changes which may be desired by such party. -12- 12 Id. at 953. Papago, like the case before us, was an appeal ___ ______ after a remand. In the first appeal the court held that the contract did not permit unilaterally effected rate increases under 205 of the Act. The Federal Power Commission held in its Order on Remand that after its first year, the contract _______________ permitted changes under 206 of the Act on the basis of a just and reasonable standard. The court agreed and interpreted the contract as follows: "the restriction envisioned during the first year of the contract must allow rate changes required by the public interest. The scheme to be in effect 'thereafter' -- obviously intended to be less restrictive -- must therefore permit changes that are just and reasonable." Papago, 723 F.2d at 954. ______ During the course of its opinion the court quoted the "public interest" standard from Sierra, 350 U.S. at 355. ______ Papago, 723 F.2d at 953. The court then went on to say in ______ dictum: [S]pecific acknowledgment of the possibility of future rate change is virtually meaningless unless it envisions a just-and-reasonable standard. The public interest standard is practically insurmountable; the Commission itself is unaware of any case granting relief under it. Future rate changes would be a dim prospect, hardly worthy of recognition, if the parties did not intend the just- and-reasonable standard to govern. Id. at 954 (citation omitted). ___ -13- 13 Papago has unfortunately been identified with the ______ notion that the "public interest" standard of review is "practically insurmountable," regardless of the circumstances of the case. This is the misreading that NUSCO presses upon us as the law of the case. We do not think that Papago, read ______ in context, means that the "public interest" standard is practically insurmountable in all circumstances. It all depends on whose ox is gored and how the public interest is affected. It should be noted that neither Mobile nor Sierra ______ ______ stated or intimated that the "public interest" doctrine was "practically insurmountable." This was a gloss that the court in Papago put on it. In Northeast I we said that the ______ ___________ "public interest" standard was "a more difficult standard for the Commission to meet than the statutory 'unjust and unreasonable' standard," 993 F.2d at 960. We, however, did not characterize the public interest standard as "practically insurmountable."1  ____________________ 1. Contrary to NUSCO's suggestion at oral argument, Boston ______ Edison v. FERC, 856 F.2d 361 (1st Cir. 1988) is not ______ ____ controlling here. In Boston Edison, we relied in part on the _____________ Mobile-Sierra doctrine to enforce a claims limitation clause _____________ of a rate contract against customers who failed to timely protest an overcharge. We found nothing "unconscionable, overweening, or otherwise unreasonable" about the clause, even with respect to the parties to the contract. Id. at 372 ___ (noting that the clause "enhances economic equilibrium by bringing certainty to the parties' dealings . . . ."). FERC and the customers did not, and clearly could not, argue that the claims limitation clause was contrary to the public interest. See id. at 372 n.12 ("we leave for another day the ___ ___ -14- 14 Our opinion also recognized that "[t]he most attractive case for affording additional protection [under the public interest standard], despite the presence of a contract, is where the protection is intended to safeguard the interests of third parties . . . ." Northeast I, 993 ___________ F.2d at 961. As we explained, the Mobile-Sierra doctrine _____________ allows FERC to modify the terms of a private contract when third parties are threatened by possible "undu[e] discrimination" or the imposition of an "excessive burden." Id. We invited FERC to demonstrate such a threat upon ___ remand. See id. at 961-62 (assuming without deciding that ___ ___ FERC's premise facts were correct, but remanding for evaluation of the contract under the public interest standard.) Although our opinion questioned the significance of the seller's market power and the lack of arms-length bargaining, id. at 961, it left open the possibility that ___ these factors may so affect third parties as to warrant intervention even under the public interest standard. See ___ id. ("there would seem to be little justification for the ___ Commission stepping in on behalf of the disfavored subsidiary absent some threat to the public interest") (emphasis added). _________________________________________ For all of these reasons, we reject NUSCO's argument that  ____________________ contours of any . . . exception" to claims limitation clauses based upon "public necessity"). -15- 15 under the law of the case the public interest standard should be considered "practically insurmountable" in all circumstances. The Order on Remand The Order on Remand ___________________ We turn to FERC's explanation of how it applied the "public interest" doctrine on remand. We conclude that if the Commission is to comply with both the Mobile-Sierra _____________ imperative to respect private contractual arrangements, on the one hand, and our statutory mandate to protect the public interest and ensure that rates are just and reasonable and not unduly discriminatory or preferential, on the other, the "public interest" standard of review under the Mobile-Sierra doctrine _____________ cannot be "practically insurmountable" in all cases. In the "classic" Mobile- _______ Sierra situation, for example -- when a ______ seller utility unilaterally seeks an increase from a fixed-rate contract already on file with the Commission -- the public interest (as opposed to the private interest of the party seeking the rate increase) only rarely is served by making the requested change (that is, granting the requested increase), and a strict standard is appropriate. In other situations, however -- when, for example, as here, the Commission is presented with an agreement for the first time and concludes that certain modifications to material rate provisions are necessary to protect the interests of non-parties -- the public interest is served by making the modifications, and a more flexible standard is therefore appropriate. Based upon that understanding of the public interest standard of review under the Mobile-Sierra doctrine, we confirm our _____________ previously ordered modifications to the Seabrook Power Contract. 66 F.E.R.C. 61,332 at 62,076 (1994) (footnotes omitted). -16- 16 In its order on remand, FERC has responded to our concerns by explaining how the disputed contractual terms may harm third parties to the contract. It no longer relies so heavily upon the possibility that the contract may favor one party over another. For example, the Commission found the automatic rate-of-return-on-equity adjustment provision unacceptable because third parties may ultimately bear the _____________ burden of a rate component that does not reflect actual capital market conditions. Likewise, the "blank check" given owners of the power plant to determine the decommissioning costs for themselves under New Hampshire law is impermissible because it may be cashed at the expense of non-parties to the contract. See 66 F.E.R.C. 61,332 at 62,090-91. This new ___ emphasis on harm to third parties suggests that FERC has done more on remand than simply substitute the words "public interest" for the forbidden phrase "just and reasonable." We end by noting the decision in Mississippi Indus. __________________ v. FERC, 808 F.2d 1525 (D.C. Cir.), cert. denied 484 U.S. 985 ____ _____ ______ (1987), a post-Papago case similar to the case at bar, which ______ shows that even the court that authored Papago does not take ______ an unduly restrictive view of the public interest standard. FERC had ordered that the four electric power companies comprising the Middle South Utilities System share the cost of the system's investment in nuclear energy in proportion to their relative demand for energy generated by the system as a -17- 17 whole. FERC reallocated responsibility for investment costs "associated with the catastrophically uneconomical Grand Gulf I nuclear plant." Id. at 1528. The court turned back a ___ jurisdictional challenge based, inter alia, on the Mobile- __________ _______ Sierra doctrine. It held, ______ that, in the instant case, this doctrine does not bar the exercise of FERC's power under section 206 of the FPA to reform a practice or contract affecting a rate charged by a public utility for wholesale service in interstate commerce. Id. at 1551. The court's discussion of the sweep of the ___ Mobile-Sierra doctrine is instructive. _____________ Finally, even if the contracts fall within the scope of the Mobile-Sierra _____________ decisions, the Supreme Court has emphasized that the relevant agency, here FERC, may always reform a contract found to be "unlawful" or "contrary to the public interest," i.e., that "contracts ____ remain fully subject to the paramount power of the Commission to modify them when necessary in the public interest." The Court stated in Sierra that the ______ Commission "has undoubted power under 206(a) to prescribe a change in contract rates whenever it determines such rates to be unlawful" and indicated three circumstances under which the Commission might conclude that a rate or a contract term affecting a rate could be found contrary to the public interest and therefore subject to revision: "where it might impair the financial ability of the public utility to continue its service, cast upon consumers an excessive burden, or be unduly discriminatory." Here FERC expressly adopted the findings of ALJ Liebman who found the level of discrimination in the [contract] "profound" and agreed that its impact on customers in Louisiana and Mississippi -18- 18 would be "dramatic[]." The Commission's specific determination of unlawfulness provides the "unequivocal public necessity" for reformation of the [contract] under section 206 of the FPA. Id. at 1553 (footnotes omitted). ___ We conclude that under the circumstances of this case FERC, on remand, gave thoughtful consideration to the public interest in reviewing its previously ordered modification of the Seabrook Power contract. We, therefore, deny NUSCO's petition for review and affirm FERC's order. We go no further. Specifically, we are not in any way suggesting the parameters of or limitations on the authority of FERC to change the contract in future rate proceedings. -19- 19