United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued February 24, 2000 Decided May 2, 2000 

 No. 99-1209

 Potomac Electric Power Company, 
 Petitioner

 v.

 Federal Energy Regulatory Commission, 
 Respondent

 FirstEnergy Corp., et al., 
 Intervenors

 On Petition for Review of Orders of the 
 Federal Energy Regulatory Commission

 Steven J. Ross argued the cause for petitioner. With him 
on the briefs were Allen C. Barringer, David B. Raskin and 
Cynthia L. Taub.

 Lona T. Perry, Attorney, Federal Energy Regulatory 
Commission, argued the cause for respondent. With her on 

the brief was John H. Conway, Deputy Solicitor. Jay L. 
Witkin, Solicitor, and Susan J. Court, Special Counsel, en-
tered appearances.

 Kevin J. McIntyre and Leonard W. Belter were on the 
brief for intervenors FirstEnergy Corp., et al.

 Before: Williams, Rogers and Garland, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Rogers.

 Rogers, Circuit Judge: Potomac Electric Power Company 
("PEPCO") petitions for review of two orders of the Federal 
Energy Regulatory Commission ("FERC") denying its re-
quest under s 206 of the Federal Power Act ("FPA"), 16 
U.S.C. s 824e (1994), for unilateral modification of the rates 
prescribed by a long-term, fixed rate, power transmission 
service agreement between PEPCO and the Allegheny Power 
System ("APS"). Because FERC did not abuse its discretion 
in applying the stringent Mobile-Sierra public interest stan-
dard, and because a mere rate disparity or a benefit to the 
purchasing utility or its customers from a rate modification 
does not suffice, without more, to satisfy that standard, we 
conclude that FERC's decision to dismiss the complaint was a 
reasonable exercise of its authority. Accordingly, we deny 
the petition.

 I.

 In 1987, PEPCO entered into an 18.5 year power supply 
agreement with the Ohio Edison System, which was com-
prised of Ohio Edison Company and Pennsylvania Power 
Company. In order to effect delivery of the power to 
PEPCO's service area, PEPCO and the Ohio Edison System 
each entered into a transmission service agreement with the 
APS, an integrated electric utility system directly connected 
to both PEPCO and the Ohio Edison System. Under the 
three agreements, PEPCO would purchase contract entitle-
ments to a share of the Ohio Edison System's installed 
generating capacity and associated energy, APS would pur-
chase from the Ohio Edison System the power intended for 
PEPCO, and APS would, in turn, resell the power purchased 

from the Ohio Edison System to PEPCO. The dispute in the 
instant case involves the agreement between PEPCO and 
APS.

 PEPCO's agreement with APS provided in relevant part 
that the base rate for the APS transmission service would 
commence at $1.70 per kW-month, increase to $2.255 per kW-
month in 1994, and increase again to $2.815 per kW-month in 
1999. In addition, the agreement required PEPCO to pay an 
"adder" of $1.00 per megawatt-hour for each megawatt-hour 
of energy that APS delivered. Furthermore, the agreement 
was a "fixed rate" contract, meaning that the parties agreed 
not to unilaterally request a rate change from the Commis-
sion, as provided in section 9.3 of the agreement, which 
stated:

 It is the intention of the parties that the rates and terms 
 of service specified herein shall remain in effect for the 
 entire term set forth in this Article, and shall not be 
 subject to change pursuant to the Federal Power Act 
 absent mutual agreement of the parties or as provided in 
 section 3.4.
 
Section 3.4, in turn, provided for renegotiation "[i]n the event 
that reasonably unforeseeable circumstances beyond the con-
trol of any party to this Agreement result in a gross inequity 
to any party" and outlined a procedure for dispute resolution 
in case parties fail to reach a new agreement.

 APS submitted the three agreements for FERC approval 
in March 1987. See Monongahela Power Co., 39 F.E.R.C. 
p 61,350, reh'g denied, 40 F.E.R.C. p 61,256 (1987). In its 
review of the filing, FERC noted that PEPCO represented 
that "the rate levels are completely justified on the basis of 
cost factors." Id. at 62,093. Also as recounted by FERC at 
the time, PEPCO maintained that "once rates are determined 
to be cost-justified, the noncost factors such as the potential 
savings to PEPCO are superfluous, and the filing cannot be 
deemed deficient even if the noncost support were deemed 
insufficient." Id. FERC also noted that "[n]o party to [the] 
proceeding has alleged that the rates under the three pro-
posed agreements are unjust and unreasonable," and that 
"[o]ur review indicates that the rates to PEPCO will not 

generate excessive revenues and should be accepted for filing 
without suspension." Id. at 62,096. FERC accepted the 
three contracts for filing to become effective June 1, 1987. 
See id. at 62,098.

 In 1996, FERC issued the first in a series of orders known 
collectively as "Order No. 888" to address problems associat-
ed with electric transmission monopolies in the bulk power 
markets. See Promoting Wholesale Competition Through 
Open Access Non-Discriminatory Transmission Services by 
Public Utilities, 61 Fed. Reg. 21,540 (1996), codified as 
revised at 18 C.F.R. Pts. 35 & 385 (1999).1 The Order 
required all public utilities that own, operate, or control 
interstate transmission facilities to file an open access non-
discriminatory transmission tariff. See id. at 21,540. In its 
open access transmission tariff ("OATT") proceeding pursu-
ant to Order No. 888, APS agreed to charge a rate of $1.49 
per kW-month for its transmission service, a rate substantial-
ly less than the rate PEPCO was obligated to pay under its 
1987 agreement with APS.

 Thereafter, PEPCO filed a complaint against APS, request-
ing that FERC summarily order APS to reduce the rate for 
transmission services under the 1987 agreement to the same 
level as APS's rate for comparable service under its OATT. 
The Federal Power Act provides that electricity rates may be 
modified in one of two ways: under s 205, the seller may 
attempt to prompt rate changes by filing a new rate schedule, 
which will be reviewed by FERC to determine whether the 
proposed rates are just and reasonable, see 16 U.S.C. s 824d, 
and under s 206, FERC may reform the rates "upon its own 
motion or upon complaint" if it determines the rates have 
become "unjust, unreasonable, unduly discriminatory or pref-

__________
 1 For the revisions and clarifications of Order No. 888, see 76 
F.E.R.C. p 61,009 (1996), 76 F.E.R.C. p 61,347 (1996), and 79 
F.E.R.C. p 61,182 (1997), on reh'g, Order No. 888-A, 62 Fed. Reg. 
12274 (1997), on reh'g, Order No. 888-B, 81 F.E.R.C. p 61,248 
(1997), on reh'g, Order No. 888-C, 82 F.E.R.C. p 61,046 (1998), on 
appeal sub nom. Transmission Access Policy Study Group, et al. v. 
FERC, No. 97-1715 (D.C. Cir.) (submitted November 3, 1999).

erential." Id. s 824e(a). PEPCO's request for a rate de-
crease, claiming that APS's rate was "excessive and unreason-
able," asked FERC to exercise its authority under s 206 to 
modify existing contracts and reduce the contractual trans-
mission rate to the OATT rate.

 APS moved to dismiss the complaint, citing section 9.3 of 
the agreement under which the parties had agreed to elimi-
nate the right of either party to initiate rate modification 
pursuant to FERC's s 206 authority. APS relied primarily 
on the "Mobile-Sierra" doctrine, named after the two Su-
preme Court cases that established the "public interest" 
standard for FERC review of electricity rates in contracts 
restraining unilateral rate changes. See United Gas Pipe 
Line Co. v. Mobile Gas Serv., 350 U.S. 332 (1956); Federal 
Power Comm'n v. Sierra Pacific Power Co., 350 U.S. 348 
(1956). Under the public interest standard of the Mobile-
Sierra doctrine, FERC has s 206 authority to modify rates 
"fixed" by a Mobile-Sierra provision " 'where [the existing 
rate structure] might impair the financial ability of the public 
utility to continue its service, cast upon other consumers an 
excessive burden, or be unduly discriminatory.' " Papago 
Tribal Util. Auth. v. FERC, 723 F.2d 950, 953 (D.C. Cir. 
1983) (alteration in original) (quoting Sierra, 350 U.S. at 355); 
see also Metropolitan Edison Co. v. FERC, 595 F.2d 851, 855 
(D.C. Cir. 1979). In essence, APS maintained that PEPCO 
failed to make the required showing under the Mobile-Sierra 
doctrine that the public interest was adversely affected by the 
existing contract.

 In response, PEPCO asserted that the public interest was 
adversely affected by the contractual rate because the exces-
sive rates were entirely borne by its ratepayers. PEPCO 
also maintained that because of APS's market power, it had 
little bargaining power at the time it entered the agreement 
to influence the terms of the contract, including the Mobile-
Sierra provision in section 9.3. Furthermore, PEPCO con-
tended that the rate APS charged itself and others, approxi-
mately half of what PEPCO was being charged for the same 
service, constituted undue discrimination prohibited under the 
Mobile-Sierra doctrine.

 FERC dismissed PEPCO's complaint. See Potomac Elec. 
Power Co. v. Allegheny Power Sys., 85 F.E.R.C. p 61,160 
(1998). Emphasizing that it "does not take contract modifica-
tion lightly," FERC reasoned that the mere fact that PEPCO 
was subject to higher rates under its agreement with APS 
than it would be under APS's OATT was insufficient reason 
for abrogating an agreement that PEPCO had fully sup-
ported at the time of filing and FERC had approved as just 
and reasonable. Id. at 61,632-33. FERC also rejected PEP-
CO's request that it act sua sponte to reduce the rates for the 
benefit of PEPCO's ratepayers, reasoning that it would be 
inappropriate to convert PEPCO's unilateral request for ref-
ormation into a FERC-initiated contract modification where 
the parties' agreement contained a Mobile-Sierra provision, 
and where PEPCO had failed to satisfy the public interest 
standard. See id. at 61,633.

 In denying PEPCO's petition for rehearing, FERC reject-
ed PEPCO's contention that FERC had erred by failing to 
assess whether the rates were just and reasonable, and 
defined the issue instead to be whether the rates, having been 
found to be just and reasonable when originally approved, 
had become contrary to the public interest. See Potomac 
Elec. Power Co. v. Allegheny Power Sys. 87 F.E.R.C. 
p 61,030, at 61,105 (1999). FERC noted that, under its prece-
dent, the fact that a contract has become uneconomic to one 
of the parties does not necessarily make the contract contrary 
to the public interest under the FPA. FERC found no 
reason to deviate from this precedent because PEPCO failed 
to present any other ground for finding the agreement con-
trary to the public interest. See id. Responding to PEPCO's 
argument that the contract was the result of uneven bargain-
ing power and that FERC's failure to modify the rates rested 
on its faulty assumption that PEPCO had willingly entered 
into the agreement, FERC stated first, that PEPCO's conten-
tion was inconsistent with PEPCO's representations in 1987, 
see id. at 61,106 n.10, and second, that FERC's decision was 
based not on PEPCO's initial willingness to enter the agree-
ment, but on PEPCO's failure to demonstrate that revising 
the agreement was in the public interest. See id. at 61,106. 

Finally, in response to PEPCO's request that FERC follow 
the approach it had adopted in Order No. 888 to allow 
modification where rates are shown to be no longer just and 
reasonable, FERC deemed the request misplaced because its 
Order No. 888 Mobile-Sierra finding applied only to a dis-
crete set of wholesale requirements contracts, not to trans-
mission contracts like the one at issue. See id. at 61,106 n.11.

 II.

 On appeal, PEPCO contends that by emphasizing only the 
policies favoring fixed rate contracts and ignoring the FPA's 
concerns with fairness and anti-competitiveness, FERC failed 
to meet the FPA's mandate. More specifically, PEPCO first 
maintains that FERC's application of the Mobile-Sierra pub-
lic interest standard ignored FERC's precedent calling for a 
"flexible" version of the test in situations where FERC is 
acting or is requested to act on behalf of non-party ratepay-
ers that are affected by the contract. Even if FERC applied 
the correct "version" of the standard, PEPCO maintains 
second that FERC failed to fulfill its obligation under the 
public interest standard to ensure that the rates charged 
under PEPCO's agreement with APS are neither unduly 
discriminatory nor excessively burdensome on PEPCO's rate-
payers. Nor had FERC, PEPCO continues, taken into ac-
count that the agreement was the result of uneven bargaining 
power, even though FERC had stated this factor was relevant 
to a public interest analysis and had made a general finding 
that transmission contracts entered into before Order No. 888 
often reflected the exercise of market power. In other 
words, PEPCO submits, FERC acted arbitrarily and capri-
ciously by not applying a flexible public interest standard and, 
alternatively, by concluding that PEPCO had not met its 
burden under the stringent Mobile-Sierra public interest 
standard.

 The court will uphold FERC's orders unless they are 
"arbitrary, capricious, an abuse of discretion, or otherwise not 
in accordance with law." 5 U.S.C. s 706(2)(A). Likewise, the 
court will uphold FERC's factual findings as long as they are 

supported by substantial evidence. See 16 U.S.C. s 825l(b); 
see also Texaco, Inc. v. FERC, 148 F.3d 1091, 1095 (D.C. Cir. 
1998) (citing Koch Gateway Pipeline Co. v. FERC, 136 F.3d 
810, 814 (D.C. Cir. 1998)). We hold that FERC's decision to 
dismiss the complaint was not an unreasonable exercise of its 
authority.

 PEPCO concedes, implicitly in its briefs and explicitly at 
oral argument, that the public interest standard set out in 
Mobile and Sierra, and not the just and reasonable standard, 
controls PEPCO's s 206 request. The court has observed 
that the Mobile-Sierra public interest standard is much more 
restrictive than the FPA's "just and reasonable" standard, 
see, e.g., Union Pacific Fuels, Inc. v. FERC, 129 F.3d 157, 
161 (D.C. Cir. 1997); San Diego Gas & Elec. Co. v. FERC, 
904 F.2d 727, 730 (D.C. Cir. 1990), even characterizing the 
burden under the public interest standard as "practically 
insurmountable," Papago, 723 F.2d at 954, and "almost insur-
mountable." Kansas Cities v. FERC, 723 F.2d 82, 87-88 
(D.C. Cir. 1983); see also Tennessee Gas Pipeline Co., 60 
F.E.R.C. p 61,318, at 62,104 (1992); Central Maine Power 
Co., 54 F.E.R.C. p 61,206, at 61,613-14 (1991). PEPCO chal-
lenges such a restrictive characterization of the standard, and 
contends that FERC was bound by its own precedent to 
adopt an approach "less restrictive" than the Papago court's 
phrase "practically insurmountable" suggests.

 For this proposition, PEPCO relies on Northeast Utilities 
Service Company, 66 F.E.R.C. p 61,332 (1994), aff'd 55 F.3d 
686 (1995). In Northeast Utilities, FERC, reviewing a rate 
agreement in connection with a utility merger, modified a 
fixed-rate contract "under the public interest standard re-
quired by the Mobile-Sierra doctrine." Id. at 62,076. In 
modifying the contract, FERC rejected the proposition that 
the Mobile-Sierra doctrine requires a generally applicable 
standard that is so stringent as to be "practically insurmount-
able." FERC explained:

 [I]f the Commission is to comply with both the Mobile-
 Sierra imperative to respect contractual arrangements, 
 on the one hand, and our statutory mandate to protect 
 
 the public interest and ensure that rates are just and 
 reasonable and not unduly discriminatory or preferential, 
 on the other, the "public interest" standard of review 
 under the Mobile-Sierra doctrine cannot be "practically 
 insurmountable" in all cases.
 
Id. (footnote omitted) (quoting Papago, 723 F.2d at 954). In 
other words, FERC took the position that the court's charac-
terization of the standard in Papago did not "preclude[ ] the 
Commission from concluding in other circumstances that the 
interests of third parties sufficiently outweigh the contracting 
parties' interests in contract stability to justify the Commis-
sion's ordering contract modifications." Id. at 62,086. FERC 
distinguished Papago on the basis that "Papago expressly 
addressed rate changes, not the scope of the Commission's 
authority upon its initial review of a newly-filed contract," id., 
and declared that in situations where it is reviewing a fixed-
rate agreement "for the first time, without having had any 
previous opportunity to determine whether its terms are 
lawful," a more relaxed public interest standard is warranted. 
Id. at 62,087. The First Circuit affirmed. See Northeast 
Utils. Serv. Co. v. FERC, 55 F.3d 686, 692 (1st Cir. 1995).

 FERC, in two subsequent cases that PEPCO also relies on, 
reaffirmed its position in Northeast Utilities. In Southern 
Company Services, Inc., 67 F.E.R.C. p 61,080 (1994), FERC 
reiterated that "the public interest standard of review does 
not bind the Commission to a practically insurmountable 
burden in all cases in which the Commission might act to 
change rates." Id. at 61,227. More specifically, FERC stat-
ed that the cases do not "impose a practically insurmountable 
burden when the Commission proceeds sua sponte or at the 
request of non-parties to change rates, terms and conditions 
in order to protect non-parties to a contract." Id. (citing 
Northeast Utils., 66 F.E.R.C. at 62,081-88). Similarly, in 
Florida Power & Light Co., 67 F.E.R.C. p 61,141 (1994), 
FERC stated, "when we are acting sua sponte or at the 
request of non-parties to change rates, terms and conditions 
in order to protect non-parties, we are not bound to a 
standard of review that is practically insurmountable." Id. at 
61,399.

 Thus, as PEPCO contends, FERC has at times expressed 
an intent to apply a standard that is more flexible than the 
"practically insurmountable" standard that Papago described. 
However, unlike the circumstances in which FERC has stated 
it would apply a more flexible standard, PEPCO's s 206 
request does not involve "the Commission proceed[ing] sua 
sponte or at the request of non-parties to change rates ... in 
order to protect non-parties to a contract." Southern Co., 67 
F.E.R.C. at 61,227; see also Florida Power, 67 F.E.R.C. at 
61,399. PEPCO is not itself a non-party. Nor did it offer 
any evidence (beyond speculation) that the only potential non-
parties here, its ratepayers, were adversely affected by the 
existing rates; it did not, for example, even attempt to show 
how much if any of the rate disparity was passed on to 
PEPCO ratepayers rather than borne by the utility itself. 
Nor does PEPCO's request involve a "newly-filed or previ-
ously unreviewed agreement." Northeast Utils, 66 F.E.R.C. 
at 62,087.2 FERC was clear in Northeast Utilities that it was 
"not being asked to allow a party a unilateral rate change 
from a fixed-rate contract whose terms [it] previously accept-
ed," and that it was instead "reviewing the ... [c]ontract for 
the first time, without having had any previous opportunity to 
determine whether its terms are lawful." Id. As FERC 
explained, applying the "practically insurmountable" standard 
in first review cases would mean that "[its] ability to protect 
the public interest would be negligible and public regulation 
would consist of little more than rubber-stamping private 
contracts." Id. By contrast, FERC had approved PEPCO's 
1987 agreement with APS long before it was presented in 
1998 with a complaint by one party to the agreement seeking 

__________
 2 This court has not had occasion to address, and need not do so 
here, whether FERC has authority to apply a Mobile-Sierra stan-
dard that is more flexible than the "practically insurmountable" 
standard whenever it reviews a "newly-filed or previously unre-
viewed agreement," Northeast Utils, 66 F.E.R.C. at 62,087, or 
"proceeds sua sponte or at the request of non-parties to change 
rates ... in order to protect non-parties to a contract." Southern 
Co., 67 F.E.R.C. at 61,227; see also Florida Power, 67 F.E.R.C. at 
61,399.

a unilateral rate change. The concerns that FERC raised in 
Northeast Utilities with regard to applying the "practically 
insurmountable" public interest standard when reviewing a 
contract for the first time thus do not apply here.

 The question remains whether FERC abused its discretion 
in concluding that PEPCO failed to meet its burden under the 
Mobile-Sierra public interest standard. PEPCO contends 
that FERC, in its public interest analysis, failed to consider 
the excessive burden on PEPCO's ratepayers and the dis-
criminatory impact of the disparity between the transmission 
rates set by the 1987 agreement and APS's OATT transmis-
sion rate. The problem with PEPCO's position is that, other 
than pointing out that the contract rate is twice APS's OATT 
rate, it has presented no evidence regarding how the contract 
rates are unduly discriminatory or excessively burdensome on 
PEPCO ratepayers. The court has repeatedly emphasized 
the importance of contractual stability in a number of cases 
involving the Mobile-Sierra doctrine. See, e.g., Maine Pub. 
Serv. Co. v. FERC, 964 F.2d 5, 10 (D.C. Cir. 1992); Cities of 
Bethany v. FERC, 727 F.2d 1131, 1139 (D.C. Cir. 1984); 
Town of Norwood v. FERC, 587 F.2d 1306, 1313 (D.C. Cir. 
1978). Furthermore, the court has consistently stated that 
rate disparity attributable to the operation of the Mobile-
Sierra doctrine is not on that basis alone unduly discriminato-
ry. See Maine Pub. Serv., 964 F.2d at 10; Cities of Bethany, 
727 F.2d at 1139, 1141; Metropolitan Edison, 595 F.2d at 857 
n.38; Boroughs of Chambersburg v. FERC, 580 F.2d 573, 
577-78 (D.C. Cir. 1978). In addition, FERC precedent makes 
clear that the fact that a contract has become uneconomic to 
one of the parties does not necessarily render the contract 
contrary to the public interest. See Soyland Power Coop., 
Inc. v. Central Illinois Pub. Serv. Co., 51 F.E.R.C. p 61,004, 
at 61,013 (1990); Public Service Co., 43 F.E.R.C. p 61,469, at 
62,152 (1988); Gulf States Utils. Co. v. Southern Co. Servs., 
Inc., 43 F.E.R.C. p 61,003, at 61,014 (1988). Considering such 
precedent in favor of protecting contractual stability, 
PEPCO's failure to provide any evidence of undue discrimina-
tion or excessive burden, other than the disparity in rates and 
a bald claim that PEPCO ratepayers would derive benefit 

from a rate modification, renders its request wholly inade-
quate. Therefore, FERC's summary dismissal of PEPCO's 
public interest argument was within its authority.

 PEPCO also maintains that because of uneven bargaining 
power in 1987, it did not necessarily enter into the fixed-rate 
agreement with APS willingly. However, PEPCO's willing-
ness was not part of FERC's rationale for dismissing the 
complaint. FERC pointed out in denying rehearing:

 The "premise" for the Commission's ruling is not that 
 PEPCO willingly agreed to the Agreement's rates and 
 terms. Rather, the "premise" for the Commission's rul-
 ing is that contract modification is not to be taken lightly 
 and that, in this case, PEPCO has failed to demonstrate 
 that a revision to the Agreement is in the public interest.
 
PEPCO, 87 F.E.R.C. at 61,106 (footnote omitted). Moreover, 
PEPCO can hardly escape the consequences of the fact that 
its statements to FERC in 1987 show that it fully supported 
the fixed-rate agreement, see id. at 61,106 n.10, and that it 
has not alleged bad faith negotiation on the part of the parties 
to the agreement. Nothing in the record on appeal demon-
strates that the contract was the result of APS's market 
power; to the contrary, PEPCO has admitted that it had 
other supply options when it entered the agreement with APS 
in 1987. See Monongahela Power Co., 39 F.E.R.C. at 62,092. 
While the existence of other options does not necessarily 
mean an absence of market power, PEPCO's assertion to 
FERC in 1987 that the transmission agreement was cost-
justified and represented cost savings over other supply 
options supports such a conclusion. Therefore, absent any 
claim, much less evidence, of unfairness or bad faith in the 
original negotiations, it is reasonable for FERC to require 
parties "to live with their bargains as time passes and various 
projections about the future are proved correct or incorrect." 
Norwood, 587 F.2d at 1312-13.

 To the extent that PEPCO maintains that FERC's refusal 
to modify the contract is inconsistent with Order No. 888-A, 
it fares no better. In Order No. 888-A, FERC found that, 
prior to July 11, 1994, wholesale requirements contracts 

were "entered into during an era in which transmission 
providers exerted monopoly control over access to their 
transmission facilities," and that, as a result, "[m]any of 
these contracts were the result of uneven bargaining power." 
Order No. 888-A, FERC Stats. & Regs. p 31,048, at 30,193 
(1997). Accordingly, FERC concluded that it was in the 
public interest to permit those requirements customers to 
seek modification of their contracts under the just and rea-
sonable standard, even if the contract contained a Mobile-
Sierra provision. See id. at 30,189. However, as PEPCO 
concedes, Order No. 888-A's exception to application of the 
Mobile-Sierra standard plainly applies only to requirements 
contracts. Moreover, as PEPCO again concedes, for non-
requirements contracts, such as the APS agreement, FERC 
declined to extend its generic Mobile-Sierra findings to all 
long-term block purchases of electricity. See id. at 30,195. 
FERC distinguished these contracts from requirements con-
tracts based on its conclusion that, in "the majority of cir-
cumstances, such long-term supply contracts are voluntary 
arrangements in which neither party had market power." 
Id. FERC noted, "[p]arties can avail themselves of the 
section 205 and 206 procedure already available if they want 
to seek modification of such contracts." Id. That is what 
PEPCO did here by requesting FERC to employ its s 206 
authority, and FERC denied PEPCO's petition under the 
Mobile-Sierra doctrine. Therefore, FERC has precisely fol-
lowed the procedure it outlined in Order No. 888-A.

 It appears, then, that PEPCO's complaint is ultimately 
directed at FERC's application of the Mobile-Sierra doctrine. 
PEPCO maintains that APS had monopoly power at the time 
of the 1987 agreement and that FERC, "[h]aving expressly 
offered buyers ... the opportunity to make section 206 filings 
to demonstrate that contracts that they previously had en-
tered into were the subject of uneven bargaining power," has 
an obligation to take APS's monopoly power into account in 
its application of the Mobile-Sierra doctrine. PEPCO's con-
tention amounts to a claim that FERC's decision to loosen the 
Mobile-Sierra standard for certain wholesale requirements 
contracts is equivalent to a commitment on FERC's part to 

conduct a case-by-case inquiry into the presence and extent of 
market power in every other non-requirement contract con-
taining a Mobile-Sierra provision. However, Order No. 
888-A merely states that "[p]arties can avail themselves of 
the section 205 and 206 procedures ... if they want to seek 
modification," id., and does not say anything one way or the 
other about the relevance of uneven bargaining power to the 
standard Mobile-Sierra analysis.3 Besides, FERC's position 
in Order No. 888-A was a carefully considered balance be-
tween "the desire to honor existing contractual arrange-
ments" and "the need to provide some means to accelerate 
the opportunity of parties to participate in competitive mar-
kets." Id. at 30,192. FERC continued, "To accomplish this 
balance, the Commission ... has made Mobile-Sierra public 
interest findings ... only as to a limited set of contracts: 
those wholesale requirements contracts executed on or before 
July 11, 1994...." Id. Therefore, any request for FERC to 
extend its Order No. 888-A exception for requirements con-
tracts must be considered in light of the need for such a 
balance, and nothing in Order No. 888-A obliges FERC to 
strike the balance in the same way in all contexts. While 
PEPCO correctly points out that FERC's discussion of 
PEPCO's No. 888-A contention is terse, see PEPCO, 87 

__________
 3 In fact, at least one circuit court has expressed skepticism 
about the relevance of uneven bargaining power in Mobile-Sierra 
analysis. The First Circuit stated:

 As for the seller's market power, reliance on this factor threat-
 ens to erode the Mobile-Sierra doctrine so substantially that a 
 fuller explanation from the Commission is required before 
 proceeding down this route. After all, some measure of mar-
 ket power could be present in a large number of contracts. A 
 case-by-case inquiry into the presence and extent of market 
 power would inject a new and potentially time-consuming ele-
 ment into the Mobile-Sierra analysis, and it is not entirely 
 clear in any event why the Commission should protect a buyer 
 who voluntarily enters into an agreement with a dominant 
 seller.
 
Northeast Utils. Serv. Co. v. FERC, 993 F.2d 937, 961 (1st Cir. 
1993).

F.E.R.C. at 61,106 n. 11, and the relevance of uneven bargain-
ing power to the Mobile-Sierra analysis remains unclear, 
PEPCO has failed to demonstrate that it was subject to 
APS's monopoly power at the time it entered into the 1987 
agreement. Having presented no evidentiary detail that 
might have compelled FERC to consider whether, by analo-
gy, it should extend its Order No. 888-A public interest 
findings on a case-by-case basis to non-requirements con-
tracts possibly involving relevantly similar factual circum-
stances, PEPCO fails to show that FERC's summary dismiss-
al was unreasonable.

 Ultimately, PEPCO's case suffers from a failure of proof. 
PEPCO's counsel explained at oral argument that PEPCO 
did not seek a hearing before FERC on its s 206 complaint 
because PEPCO considered its allegations regarding the im-
pact of the 1987 agreement on its ratepayers to be unrebut-
ted. The court strains, in light of precedent, to imagine how 
PEPCO could conclude that it did not have a burden to offer 
evidence on this and other relevant factual issues, such as 
whether and the extent to which the agreement rates ad-
versely impact PEPCO's ratepayers and whether APS had 
market power at the time the 1987 agreements were signed. 
PEPCO's position would undoubtedly have been strengthened 
had there been evidence in the record to support the asser-
tions in its briefs regarding the asserted impact on ratepayers 
and APS's market power, although we express no opinion on 
the outcome under those circumstances.

 In sum, given the practically insurmountable standard that 
it faced, PEPCO was obligated to do more than point to the 
disparity between the agreement rates and the rates it would 
pay under the APS open access tariff. FERC reasonably 
concluded that PEPCO failed to demonstrate that the APS 
rates in the 1987 agreement are contrary to the public 
interest. While FERC retains the statutory authority and 
duty to correct or prevent an electric rate schedule that 
" 'might impair the financial ability of the public utility to 
continue its service, cast upon other consumers an excessive 
burden, or be unduly discriminatory,' " Papago 723 F.2d at 
953 (quoting Sierra, 350 U.S. at 355), it acted within its 
discretion to conclude from the face of the complaint that the 

rates in the previously approved agreement that PEPCO fully 
supported and claimed was justified were not contrary to the 
public interest. Accordingly, we deny the petition.